STATE OF CONNECTICUT *v.* FERNANDO A.*
(SC 18045)
(SC 18103)

Rogers, C. J., and Norcott, Palmer, Vertefeuille, Zarella, Schaller and McLachlan, Js.[1]

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victims or others through whom the victims' identities may be ascertained. See General Statutes § 54-86e.

[1] This case originally was argued before a panel of this court consisting of Justices Norcott, Palmer, Vertefeuille, Zarella and Schaller. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Rogers and Justice McLachlan were added to the panel, and they have read the record, briefs and transcript of oral argument.

The listing of justices reflects their seniority status as of the date of oral argument.

1

Argued March 12, 2008—officially released November 3, 2009

*Steven D. Ecker*, with whom was *Alinor C. Sterling*, for the appellant (defendant).

*Robert J. Scheinblum*, senior assistant state's attorney, with whom, on the brief, were *David I. Cohen*, state's attorney, *Kevin J. Dunn*, assistant state's attorney, and *David R. Applegate*, deputy assistant state's attorney, for the appellee (state).

*Richard Blumenthal*, attorney general, and *Jane R. Rosenberg* and *Susan Quinn Cobb*, assistant attorneys general, filed a brief for the department of children and families as amicus curiae.

*Hakima Bey-Coon* filed a brief for the office of the victim advocate as amicus curiae.

*Daniel J. Foster* filed a brief for the American Civil Liberties Union Foundation of Connecticut as amicus curiae.

*Anne C. Dranginis* and *Proloy K. Das* filed a brief for the Connecticut Coalition Against Domestic Violence as amicus curiae.

*Opinion*

NORCOTT, J. In this public interest appeal, we consider the nature of the hearing that a defendant must receive prior to the issuance of a criminal protective order in a family violence case (criminal protective order) pursuant to General Statutes § 54-63c (b).[2] The defendant, Fernando A., appeals, upon the grant of his

---

[2] General Statutes § 54-63c (b) provides: "If the person is charged with the commission of a family violence crime, as defined in section 46b-38a, and the police officer does not intend to impose nonfinancial conditions of release pursuant to this subsection, the police officer shall, pursuant to the procedure set forth in subsection (a) of this section, promptly order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer. If such person is not so released, the police officer shall make reasonable efforts to immediately contact a bail commissioner to set the conditions of such person's release pursuant to section 54-63d. If, after making such reasonable efforts, the police officer is unable to contact a bail commissioner or contacts a bail commissioner but such bail commissioner is unavailable to promptly perform such bail commissioner's duties pursuant to section 54-63d, the police officer shall, pursuant to the procedure set forth in subsection (a) of this section, order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer and may impose nonfinancial conditions of release which may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance. Any such nonfinancial conditions of release shall be indicated on a form prescribed by the Judicial Branch and sworn to by the police officer. Such form shall articulate (A) the efforts that were made to contact a bail commissioner, (B) the specific factual basis relied upon by the police officer to impose the nonfinancial conditions of release, and (C) if the arrested person was non-English-speaking, that the services of a translation

application filed pursuant to General Statutes § 52-265a,[3] from the trial court's denial of his request for an

service or interpreter were used. A copy of that portion of the form that indicates the nonfinancial conditions of release shall immediately be provided to the arrested person. A copy of the entire form shall be provided to counsel for the arrested person at arraignment. Any nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54-1g. On such date, the court shall conduct a hearing pursuant to section 46b-38c at which the defendant is entitled to be heard with respect to the issuance of a protective order."

Section 54-63c was substantially amended by No. 07-123, § 1, of the 2007 Public Acts, which was effective at the time of the defendant's arrest. Hereafter, unless otherwise indicated, references to this statute in this opinion are to the current revision, which includes the changes effected by that amendment.

[3] This appeal is the consolidation of two separate proceedings, Docket Nos. SC 18045 and SC 18103. Docket No. SC 18045 is an appeal from the October 18, 2007 order of the trial court, *Bingham, J.*, filed pursuant to General Statutes § 52-265a, which provides in relevant part: "(a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the Superior Court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the Supreme Court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The Chief Justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice. . . ."

Because Chief Justice Rogers was unavailable, Justice Norcott, as the senior available associate justice, considered and granted the defendant's application in SC 18045 pursuant to Practice Book § 83-4. In addition, we note that this interlocutory appeal properly is before this court because "the 'order or decision' referred to in § 52-265a from which an appeal may be taken need not be a final judgment." *Laurel Park, Inc.* v. *Pac*, 194 Conn. 677, 678 n.1, 485 A.2d 1272 (1984).

Docket No. SC 18103 is an appeal from the October 15, 2007 order of the trial court, *Pavia, J.*, to the Appellate Court, and raises an issue identical to that of the certified appeal in SC 18045. Ordinarily, this appeal would not properly be before this court because a defendant's exclusive nondiscretionary remedy from an order concerning conditions of release is a petition to the Appellate Court pursuant to General Statutes § 54-63g. See *State* v. *Ayala*, 222 Conn. 331, 338–39, 610 A.2d 1162 (1992). Nevertheless, we will exercise our discretion and treat the defendant's appeal in SC 18103 as a properly filed bail review petition in the Appellate Court. Cf. id., 341–42 (dismissing defendant's petition for certification to appeal pursuant to General Statutes § 51-197f from Appellate Court's determination on bail review motion, but treating that petition as properly filed § 52-265a petition). Inas-

evidentiary hearing prior to the issuance of a criminal protective order. We conclude that § 54-63c (b), and the cross-referenced General Statutes § 46b-38c,[4] per-

much as SC 18103 is related to SC 18045, which is properly before this court pursuant to § 52-265a, we have transferred SC 18103 from the Appellate Court to this court, and consolidated it with SC 18045 pursuant to Practice Book § 61-7 and Practice Book § 65-3, which permits the transfer of release review petitions from the Appellate Court to this court *"in any case on appeal to the supreme court* . . . ." (Emphasis added.)

[4] General Statutes § 46b-38c provides in relevant part: "(a) There shall be family violence response and intervention units in the Connecticut judicial system to respond to cases involving family violence. The units shall be coordinated and governed by formal agreement between the Chief State's Attorney and the Judicial Department.

"(b) The Court Support Services Division, in accordance with the agreement between the Chief State's Attorney and the Judicial Department, shall establish within each geographical area of the Superior Court a local family violence intervention unit to implement sections 46b-1, 46b-15, 46b-38a to 46b-38f, inclusive, and 54-1g. The Court Support Services Division shall oversee direct operations of the local units.

"(c) Each such local family violence intervention unit shall: (1) Accept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date to be presented at any time during the court session on that date, (3) provide or arrange for services to victims and offenders, (4) administer contracts to carry out such services, and (5) establish centralized reporting procedures. All information provided to a family relations officer in a local family violence intervention unit shall be solely for the purposes of preparation of the report and the protective order forms for each case and recommendation of services and shall otherwise be confidential and retained in the files of such unit and not be subject to subpoena or other court process for use in any other proceeding or for any other purpose, except that if the victim has indicated that the defendant holds a permit to carry a pistol or revolver or possesses one or more firearms, the family relations officer shall disclose such information to the court and the prosecuting authority for appropriate action.

"(d) In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date. A judge of the Superior Court may consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment. Such protective order shall be an order of the court, and the clerk of the court shall cause (A) a certified copy of such order to be sent to the victim, and (B) a copy of such order, or the information contained in such order, to be sent by facsimile or other means within forty-eight hours of its issuance to the law enforcement agency for the town in which the victim resides and, if the defendant resides in a town different from the town in which the victim

mit the trial court to issue a criminal protective order at the defendant's arraignment after consideration of oral argument and the family violence intervention unit's report (family services report). We also conclude that the trial court is required to hold, at the defendant's request made at the initial hearing, a subsequent hearing within a reasonable period of time at which the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence,

resides, to the law enforcement agency for the town in which the defendant resides. If the victim is employed in a town different from the town in which the victim resides, the clerk of the court shall, upon the request of the victim, send, by facsimile or other means, a copy of such order, or the information contained in such order, to the law enforcement agency for the town in which the victim is employed within forty-eight hours of the issuance of such order.

"(e) A protective order issued under this section may include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant, including, but not limited to, an order enjoining the defendant from (1) imposing any restraint upon the person or liberty of the victim, (2) threatening, harassing, assaulting, molesting or sexually assaulting the victim, or (3) entering the family dwelling or the dwelling of the victim. A protective order issued under this section may include provisions necessary to protect any animal owned or kept by the victim including, but not limited to, an order enjoining the defendant from injuring or threatening to injure such animal. Such order shall be made a condition of the bail or release of the defendant and shall contain the following language: 'In accordance with section 53a-223 of the Connecticut general statutes, any violation of this order constitutes criminal violation of a protective order which is punishable by a term of imprisonment of not more than five years, a fine of not more than five thousand dollars, or both. Additionally, in accordance with section 53a-107 of the Connecticut general statutes, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree which is punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars, or both. Violation of this order also violates a condition of your bail or release, and may result in raising the amount of bail or revoking release.' Every order of the court made in accordance with this section after notice and hearing shall also contain the following language: 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order. Pursuant to the Violence Against Women Act of 1994, 18 USC 2265, this order is valid and enforceable in all fifty states, any territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico and tribal lands.' The information contained in and concerning the issuance of any protective order issued under this section shall be entered in the registry of protective orders pursuant to section 51-5c. . . ."

which may include reliable hearsay. Because the defendant did not receive this subsequent hearing as requested, we reverse the decision of the trial court.

The record reveals the following undisputed facts and procedural history. The defendant and his wife are involved in divorce proceedings. On October 14, 2007, the defendant was arrested on numerous family violence criminal charges arising from an incident wherein he allegedly had assaulted his wife.[5] Pursuant to § 54-63c (b), the police released the defendant that day on the conditions that he not enter the family home and that he avoid contact with his wife pending his first court appearance. At that appearance on October 15, 2007, the trial court, *Pavia, J.*, reviewed the family services report, and issued a criminal protective order as a condition of his pretrial release. Judge Pavia denied the defendant's request for an evidentiary hearing at that time, reasoning that "immediate judicial review of this matter is necessary to protect the safety and well-being of the victim and the family," and that "the need for expeditious assumption of judicial control following a defendant's arrest outweighs the need to minimize risk of error through adversary procedures." Judge Pavia then continued the case to October 18, 2007, so that the defendant could request a hearing on that date.

Subsequently, on October 18, 2007, the defendant appeared before the trial court, *Bingham, J.*, to request an evidentiary hearing to contest the continuation of the criminal protective order. The defendant argued that he was entitled to a full evidentiary hearing under both § 54-63c and the due process clause of the four-

---

[5] The defendant was charged with one count each of the crimes of assault in the third degree in violation of General Statutes § 53a-61, disorderly conduct in violation of General Statutes § 53a-182, and reckless endangerment in the second degree in violation of General Statutes § 53a-64, and two counts of the crime of risk of injury to a child in violation of General Statutes (Rev. to 2007) § 53-21 (a) (1).

teenth amendment to the United States constitution[6] because the criminal protective order interfered with his "fundamental constitutional liberties to family integrity: his right to be in his home, and not to be subject to a restraining order issued by a court and law enforcement authorities without judicial imprimatur." Judge Bingham denied the defendant's request for an evidentiary hearing, reasoning that the procedure for issuing a domestic violence protective order in criminal cases "is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing."[7] See also footnote 26 of this opinion. This certified and expedited appeal followed.[8] See footnote 3 of this opinion.

On appeal, the defendant contends, inter alia, that the trial court improperly failed to conduct an evidentiary hearing prior to issuing a criminal protective order because § 54-63c (b) "expressly require[d]" the trial court to hold such a hearing when he first appeared in court. The defendant argues that the word "hearing," as used in § 54-63c (b), means an adversarial and formal adjudicative proceeding at which issues of fact and law are tried, evidence is taken, and witnesses and parties are heard. The defendant further contends that the cross-reference in § 54-63c (b) to § 46b-38c, the family violence criminal procedure statute that authorizes courts to impose criminal protective orders at the defen-

---

[6] The fourteenth amendment to the United States constitution, § 1, provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

[7] Specifically, Judge Bingham concluded that giving the defendant a full evidentiary hearing with the right to examine and subpoena witnesses, including the complainant, would place an "undue burden" on the complainant, who had indicated her fear of the defendant. Judge Bingham also rejected the defendant's statutory argument, concluding that the language of the statute did not expressly mandate a "full evidentiary hearing," and required only notice and the opportunity to be heard. For a more complete discussion of Judge Bingham's ruling, see footnote 26 of this opinion.

[8] We note that Judge Bingham subsequently modified the criminal protective order to permit the defendant some visitation with his children.

dant's first court appearance; see footnote 4 of this opinion; requires that the criminal statute be applied consistently with the similarly worded General Statutes § 46b-15,[9] which, he argues, contemplates a full evidentiary hearing within fourteen days of the ex parte issu-

[9] General Statutes § 46b-15 provides in relevant part: "(a) Any family or household member as defined in section 46b-38a who has been subjected to a continuous threat of present physical pain or physical injury by another family or household member or person in, or has recently been in, a dating relationship who has been subjected to a continuous threat of present physical pain or physical injury by the other person in such relationship may make an application to the Superior Court for relief under this section.

"(b) The application form shall allow the applicant, at the applicant's option, to indicate whether the respondent holds a permit to carry a pistol or revolver or possesses one or more firearms. The application shall be accompanied by an affidavit made under oath which includes a brief statement of the conditions from which relief is sought. Upon receipt of the application the court shall order that a hearing on the application be held not later than fourteen days from the date of the order. The court, in its discretion, may make such orders as it deems appropriate for the protection of the applicant and such dependent children or other persons as the court sees fit. Such order may include temporary child custody or visitation rights and such relief may include but is not limited to an order enjoining the respondent from (1) imposing any restraint upon the person or liberty of the applicant; (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking the applicant; or (3) entering the family dwelling or the dwelling of the applicant. The court, in its discretion, may make such orders as it deems appropriate for the protection of any animal owned or kept by the applicant including, but not limited to, an order enjoining the respondent from injuring or threatening to injure such animal. If an applicant alleges an immediate and present physical danger to the applicant, the court may issue an ex parte order granting such relief as it deems appropriate. If a postponement of a hearing on the application is requested by either party and granted, the order shall not be continued except upon agreement of the parties or by order of the court for good cause shown.

"(c) Every order of the court made in accordance with this section shall contain the following language: 'This order may be extended by the court beyond six months. In accordance with section 53a-107, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree. This is a criminal offense punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars or both.'

"(d) No order of the court shall exceed six months, except that an order may be extended by the court upon motion of the applicant for such additional time as the court deems necessary. If the respondent has not appeared

ance of a civil domestic violence temporary restraining order. Finally, the defendant cites the legislative history of the statutes, and also relies on the rule of lenity, under which ambiguous criminal statutes are construed against the state.

In response, the state contends that criminal protective orders arise from bail or pretrial release proceedings that do not by themselves require an evidentiary hearing. The state also argues that, when the legislature enacted No. 07-123, § 1, of the 2007 Public Acts (P.A. 07-123), which amended § 54-63c (b), it presumptively

upon the initial application, service of a motion to extend an order may be made by first-class mail directed to the respondent at his or her last known address.

"(e) The applicant shall cause notice of the hearing pursuant to subsection (b) of this section and a copy of the application and the applicant's affidavit and of any ex parte order issued pursuant to subsection (b) of this section to be served on the respondent not less than five days before the hearing. The cost of such service shall be paid for by the Judicial Branch. Upon the granting of an ex parte order, the clerk of the court shall provide two certified copies of the order to the applicant. Upon the granting of an order after notice and hearing, the clerk of the court shall provide two certified copies of the order to the applicant and a copy to the respondent. Every order of the court made in accordance with this section after notice and hearing shall contain the following language: 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order. Pursuant to the Violence Against Women Act of 1994, 18 USC 2265, this order is valid and enforceable in all fifty states, any territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico and tribal lands.' Immediately after making service on the respondent, the proper officer shall send or cause to be sent, by facsimile or other means, a copy of the application, or the information contained in such application, stating the date and time the respondent was served, to the law enforcement agency or agencies for the town in which the applicant resides, the town in which the applicant is employed and the town in which the respondent resides. The clerk of the court shall send, by facsimile or other means, a copy of any ex parte order and of any order after notice and hearing, or the information contained in any such order, to the law enforcement agency or agencies for the town in which the applicant resides, the town in which the applicant is employed and the town in which the respondent resides, within forty-eight hours of the issuance of such order. . . ."

was aware of *State* v. *Doe*, 46 Conn. Sup. 598, 610, 765 A.2d 518 (2000), which held that an evidentiary hearing is not constitutionally required prior to the issuance of a criminal protective order under § 46b-38c. Thus, had the legislature intended to require a full evidentiary hearing, it would have drafted § 54-63c (b) using language similar to that contained in the witness protective order statute, General Statutes § 54-82r.[10] Finally, the

[10] General Statutes § 54-82r provides in relevant part: "(a) Upon application of a prosecutorial official, a court may issue a protective order prohibiting the harassment of a witness in a criminal case if the court, after a hearing at which hearsay evidence shall be admissible, finds by a preponderance of the evidence that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of a violation of section 53a-151 or 53a-151a. Any adverse party named in the complaint has the right to present evidence and cross-examine witnesses at such hearing. Such order shall be an order of the court, and the clerk of the court shall cause a certified copy of such order to be sent to the witness, and a copy of such order, or the information contained in such order, to be sent by facsimile or other means within forty-eight hours of its issuance to the appropriate law enforcement agency.

"(b) A protective order shall set forth the reasons for the issuance of such order, be specific in terms and describe in reasonable detail, and not by reference to the complaint or other document, the act or acts being restrained. A protective order issued under this section may include provisions necessary to protect the witness from threats, harassment, injury or intimidation by the adverse party including, but not limited to, enjoining the adverse party from (1) imposing any restraint upon the person or liberty of the witness, (2) threatening, harassing, assaulting, molesting or sexually assaulting the witness, or (3) entering the dwelling of the witness. Such order shall contain the following language: 'In accordance with section 53a-223 of the Connecticut general statutes, any violation of this order constitutes criminal violation of a protective order which is punishable by a term of imprisonment of not more than five years, a fine of not more than five thousand dollars, or both. Additionally, in accordance with section 53a-107 of the Connecticut general statutes, entering or remaining in a building or any other premises in violation of this order constitutes criminal trespass in the first degree which is punishable by a term of imprisonment of not more than one year, a fine of not more than two thousand dollars, or both.' If the adverse party is the defendant in the criminal case, such order shall be made a condition of the bail or release of the defendant and shall also contain the following language: 'Violation of this order also violates a condition of your bail or release and may result in raising the amount of bail or revoking release.' . . ."

state argues that the rule of lenity is inapplicable because it applies only when the statutory language, legislative history and underlying policies fail to resolve the ambiguity. Although we agree with the state that §§ 54-63c (b) and 46b-38c (d) permit the trial court to issue a criminal protective order at arraignment after consideration of oral argument and the family services report, we also conclude that those statutes require the trial court to hold, at the defendant's request made at the initial hearing, a subsequent hearing within a reasonable period of time wherein the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay.[11]

"Issues of statutory construction raise questions of law, over which we exercise plenary review. . . . The process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply. . . .

"When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case,

---

[11] On appeal, the defendant also renews his claim that the due process clauses of the United States and Connecticut constitutions; see U.S. Const., amend. XIV, § 1; Conn. Const., art. I, § 8; entitle him to an evidentiary hearing prior to the issuance of a criminal protective order. Because of our conclusion with respect to the defendant's statutory claims, and the fact that he notes that a civil protective order hearing under § 46b-15 (b) may be delayed for up to fourteen days, and concedes that "a short delay in the hearing date likely would not violate due process requirements," we do not reach these constitutional issues, except as necessary to delineate the contours of the hearing required by §§ 54-63c (b) and 46b-38c (d). See, e.g., *Kelo* v. *New London*, 268 Conn. 1, 12 n.10, 843 A.2d 500 (2004), aff'd, 545 U.S. 469, 125 S. Ct. 2655, 162 L. Ed. 2d 439 (2005); see also footnote 21 of this opinion.

including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Felician Sisters of St. Francis of Connecticut, Inc.* v. *Historic District Commission*, 284 Conn. 838, 847, 937 A.2d 39 (2008).

We begin with the text of § 54-63c (b), which authorizes police officers in "family violence crime" cases, after making "reasonable," but unsuccessful, attempts to reach a bail commissioner, to "order the release of such person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer and may impose nonfinancial conditions of release which may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance. . . ."[12] Section 54-63c (b) then

---

[12] The procedure for the release of an arrestee is set forth by General Statutes § 54-63c (a), which provides: "Except in cases of arrest pursuant to a bench warrant of arrest in which the court or a judge thereof has indicated that bail should be denied or ordered that the officer or indifferent person making such arrest shall, without undue delay, bring such person before the clerk or assistant clerk of the superior court for the geographical area under section 54-2a, when any person is arrested for a bailable offense, the chief of police, or the chief's authorized designee, of the police department having custody of the arrested person shall promptly advise such

provides that: "Any nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54-1g.[13] *On such date, the court shall conduct a hearing pursuant to section 46b-38c at which the defendant is entitled to be heard with respect to the issuance of a protective order.*" (Emphasis added.)

The text of § 54-63c (b) does not specify the nature of the hearing other than describing it as one held "pursuant to section 46b-38c," upon being presented to the trial court pursuant to General Statutes § 54-1g (a). Thus, § 54-63c (b) must be read in conjunction with § 46b-38c (a), which establishes "family violence

---

person of the person's rights under section 54-1b, and of the person's right to be interviewed concerning the terms and conditions of release. Unless the arrested person waives or refuses such interview, the police officer shall promptly interview the arrested person to obtain information relevant to the terms and conditions of the person's release from custody, and shall seek independent verification of such information where necessary. At the request of the arrested person, the person's counsel may be present during the interview. No statement made by the arrested person in response to any question during the interview related to the terms and conditions of release shall be admissible as evidence against the arrested person in any proceeding arising from the incident for which the conditions of release were set. After such a waiver, refusal or interview, the police officer shall promptly order release of the arrested person upon the execution of a written promise to appear or the posting of such bond as may be set by the police officer, except that no condition of release set by the court or a judge thereof may be modified by such officer and no person shall be released upon the execution of a written promise to appear or the posting of a bond without surety if the person is charged with the commission of a family violence crime, as defined in section 46b-38a, and in the commission of such crime the person used or threatened the use of a firearm."

[13] General Statutes § 54-1g (a) provides: "Any arrested person who is not released sooner or who is charged with a family violence crime as defined in section 46b-38a or a violation of section 53a-181c, 53a-181d or 53a-181e shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed. If an arrested person is hospitalized, or has escaped or is otherwise incapacitated, the person shall be presented, if practicable, to the first regular sitting after return to police custody."

response and intervention units in the Connecticut judicial system to respond to cases involving family violence . . . [which] shall be coordinated and governed by formal agreement between the Chief State's Attorney and the Judicial Department." Each geographical area of the Superior Court has a "local family violence intervention unit"; General Statutes § 46b-38c (b); that is required to: "(1) [a]ccept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date to be presented at any time during the court session on that date, (3) provide or arrange for services to victims and offenders, (4) administer contracts to carry out such services, and (5) establish centralized reporting procedures. . . ." General Statutes § 46b-38c (c); see also footnote 4 of this opinion.

Subsection (d) of § 46b-38c prescribes only certain limited aspects of the hearing process and provides: "In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date. . . ." With the family services report available to it, the trial court then is authorized to "consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment. . . ." General Statutes § 46b-38c (d); see also footnote 4 of this opinion.

Similar to § 54-63c (b), the text of § 46b-38c (d) does not specify the precise nature of how the hearing shall be conducted, or what the defendant's rights are therein. Because the term "hearing" is "not defined in

the statute, General Statutes § 1-1 (a) requires that we construe the term in accordance with the commonly approved usage of the language. . . . If a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary." (Citation omitted; internal quotation marks omitted.) *Jim's Auto Body* v. *Commissioner of Motor Vehicles*, 285 Conn. 794, 808, 942 A.2d 305 (2008). The word "hearing" is defined alternatively as an "opportunity to be heard, to present one's side of a case, or to be generally known or appreciated," "a listening to arguments" or "a preliminary examination in criminal procedure . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). Similarly, Black's Law Dictionary (7th Ed. 1999) defines "hearing" as a "judicial session, usu[ally] open to the public, held for the purpose of deciding issues of fact or of law, *sometimes with witnesses testifying* . . . ." (Emphasis added.) Resorting to these dictionary definitions does not answer conclusively the question of whether a hearing under § 54-63c (b) must be evidentiary in nature. The statute is, therefore, ambiguous, and we may consult extratextual sources in resolving this issue. See General Statutes § 1-2z.

The legislative history of both §§ 46b-38c and 54-63c (b) similarly does not disclose clearly the nature of the hearing required. The history of P.A. 07-123, codified in part at § 54-63c (b), indicates only that the statute was enacted to authorize police officers, in the event that "reasonable efforts" to locate a bail commissioner failed, to impose nonfinancial conditions of release pending the defendant's first appearance before the trial court. See 50 S. Proc., Pt. 11, 2007 Sess., p. 3390, remarks of Senator Andrew McDonald (noting "problem in our domestic violence laws and domestic family relations laws with the setting of bail conditions when an individual is arrested, most normally, over the weekend");

see also 50 H.R. Proc., Pt. 12, 2007 Sess., pp. 3875–76, remarks of Representative Michael Lawlor (authority of police to impose nonfinancial conditions is limited to "between the time the person is actually arrested and released, and the time the courts actually open, which would typically be the next day, or in the case of a Friday night or Saturday arrest, on Monday morning"). In enacting P.A. 07-123, the legislature recognized that giving police officers this authority to impose release conditions would avoid the unnecessary detention of defendants, while providing additional and formal protection for complainants pending the defendant's first court appearance. See 50 H.R. Proc., supra, pp. 3886–88; see also id., p. 3895, remarks of Representative Kevin Witkos ("[o]ftentimes prior to this, the party was taken out of the home, brought down to the police station and the victim remained at home unknowing whether that person would return home to cause greater harm").

The legislative history of the cross-referenced § 46b-38c similarly fails to illuminate the nature of the required hearing. That statute was enacted in 1986 in response to the domestic abuse of Tracey Thurman, a woman whose local police department had failed to aid her after repeated beatings by her former husband. See 29 H.R. Proc., Pt. 14, 1986 Sess., pp. 5258–59, remarks of Representative Pauline Kezer. The legislature created family violence response and intervention units to accept referrals of family violence cases from judges or prosecutors, and prepare family services reports and recommendations for the court based on interviews of the complainant and the defendant. See General Statutes § 46b-38c (c) and (d). The legislative history of § 46b-38c does not, however, explain further the nature of the hearing that should be held before the trial court on the defendant's first court date.

Other factors, however, lead us to conclude that the legislature did not intend for a hearing held pursuant to §§ 54-63c (b) and 46b-38c (d) to be a full evidentiary proceeding akin to a minitrial. In particular, we note that "[t]he legislature is presumed to know the judicial interpretation placed upon a statute"; *Charles* v. *Charles*, 243 Conn. 255, 262, 701 A.2d 650 (1997), cert. denied, 523 U.S. 1136, 118 S. Ct. 1838, 140 L. Ed. 2d 1089 (1998); and that the legislature "is presumed . . . to be cognizant of judicial decisions relevant to the subject matter of a statute . . . and to know the state of existing relevant law when it enacts a statute." (Citations omitted; internal quotation marks omitted.) *State* v. *Dabkowski*, 199 Conn. 193, 201, 506 A.2d 118 (1986).

Thus, it is significant that the language of § 54-63c (b) contemplates that the criminal protective order hearing held pursuant to § 46b-38c will be held in conjunction with an arraignment pursuant to § 54-1g (a). This is because the Superior Court, in the 2000 decision in *State* v. *Doe*, supra, 46 Conn. Sup. 598, relied on *Gerstein* v. *Pugh*, 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975), and concluded that a hearing held pursuant to § 46b-38c, at which the defendant did not have the opportunity to cross-examine the complainant prior to the issuance of a criminal protective order in a family violence case, did not violate the defendant's due process rights because it was a bail related hearing that required "the need for expeditious assumption of judicial control . . . ." (Internal quotation marks omitted.) *State* v. *Doe*, supra, 609. The court reasoned that "the defendant may at any time have the conditions of his release modified pursuant to General Statutes § 54-69.[14]

---

[14] General Statutes § 54-69 provides in relevant part: "(a) Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney

At that time, the defendant is entitled to have a full hearing." Id., 610. Thus, when the legislature amended § 54-63c (b) by enacting P.A. 07-123, it presumably was aware of a published decision concluding that a full adversarial hearing was not constitutionally required for the initial issuance at arraignment of a criminal protective order pursuant to § 46b-38c. Accordingly, we find it significant that the legislature failed to amend the statute by imposing specific hearing requirements when it enacted P.A. 07-123.[15] See, e.g., *Mahon* v. *B.V. Unitron Mfg., Inc.*, 284 Conn. 645, 665, 935 A.2d 1004 (2007) ("[a]lthough we are aware that legislative inaction is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [the court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation" [internal quotation marks omitted]).

---

or assistant state's attorney *or the accused person* may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses *continue, modify or set conditions of release* upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary. . . ." (Emphasis added.)

[15] Although *State* v. *Doe*, supra, 46 Conn. Sup. 598, is a Superior Court decision, rather than an opinion of this court or the Appellate Court, we may rely on the doctrine of legislative acquiescence because, as an officially published decision, it is part of a limited group of trial court opinions that are "useful as precedents or [whose publication] will serve the public interest . . . ." General Statutes § 51-215a (a). Thus, we disagree with Justice Palmer's criticism in his dissent of our reliance on *Doe* as "stretch[ing] the doctrine of legislative acquiescence beyond its breaking point." Although we acknowledge, and presume that the legislature is aware of, the decisional hierarchy in the court system, the fact that *Doe* is a Superior Court decision not binding statewide does not detract from its status at that time as the only published authority construing § 46b-38c.

We also are "guided by the principle that the legislature is always presumed to have created a harmonious and consistent body of law . . . . [T]his tenet of statutory construction . . . requires us to read statutes together when they relate to the same subject matter . . . . Accordingly, [i]n determining the meaning of a statute . . . we look not only at the provision at issue, but also to the broader statutory scheme to ensure the coherency of our construction. . . . Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed. . . . That tenet of statutory construction is well grounded because [t]he General Assembly is always presumed to know all the existing statutes and the effect that its action or non-action will have upon any one of them." (Citations omitted; internal quotation marks omitted.) *Hatt* v. *Burlington Coat Factory*, 263 Conn. 279, 310, 819 A.2d 260 (2003).

A review of other criminal procedure statutes demonstrates that, when the legislature has desired to impose specific requirements on the conduct of a pretrial hearing, it has said so explicitly. For example, § 54-82r, which authorizes courts to impose protective orders prohibiting the harassment of witnesses in criminal cases; see footnote 10 of this opinion; is drafted similarly to § 54-63c. Unlike the family violence statute, however, the legislature specifically required in § 54-82r (a) that a judge considering the entry of a protective order for the benefit of a witness hold a "hearing at which hearsay evidence shall be admissible" and "[find] by a preponderance of the evidence that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of a violation of section 53a-151 or 53a-151a. *Any adverse party named in the complaint has the right to present evidence and cross-examine wit-*

*nesses at such hearing. . . ."* (Emphasis added.) Similarly, General Statutes § 54-64f,[16] which authorizes trial courts to impose different conditions or to revoke the bail of defendants who have violated the "reasonable conditions" of their releases, similarly requires an "evidentiary hearing at which hearsay or secondary evidence shall be admissible," along with a finding of the violation "by clear and convincing evidence . . . ." General Statutes § 54-64f (b) and (c). Thus, the text of related criminal procedure statutes indicates that, had the legislature intended the initial criminal protective order hearing to be evidentiary in nature in every case, it easily could have so required.[17] See *In re Ralph M.,*

---

[16] General Statutes § 54-64f provides in relevant part: "(a) Upon application by the prosecuting authority alleging that a defendant has violated the conditions of the defendant's release, the court may, if probable cause is found, order that the defendant appear in court for an evidentiary hearing upon such allegations. An order to appear shall be served upon the defendant by any law enforcement officer delivering a copy to the defendant personally, or by leaving it at the defendant's usual place of abode with a person of suitable age and discretion then residing therein, or mailing it by registered or certified mail to the last-known address of the defendant.

"(b) If the court, *after an evidentiary hearing at which hearsay or secondary evidence shall be admissible,* finds by clear and convincing evidence that the defendant has violated reasonable conditions imposed on the defendant's release it may impose different or additional conditions upon the defendant's release. If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, after an evidentiary hearing at which hearsay or secondary evidence shall be admissible, finds by clear and convincing evidence that the defendant has violated reasonable conditions of the defendant's release and that the safety of any other person is endangered while the defendant is on release, it may revoke such release.

"(c) If the defendant is on release with respect to an offense for which a term of imprisonment of ten or more years may be imposed and the court, *after an evidentiary hearing at which hearsay or secondary evidence shall be admissible,* finds by clear and convincing evidence that the safety of any other person is endangered while the defendant is on release and that there is probable cause to believe that the defendant has committed a federal, state or local crime while on release, there shall be a rebuttable presumption that the defendant's release should be revoked. . . ." (Emphasis added.)

[17] Other statutes similarly are illustrative of the legislature's prerogative to require that the courts conduct a certain type of adversarial or evidentiary hearing. See, e.g., General Statutes § 17a-498 (c) (At a Probate Court hearing on an application for a civil commitment of a mentally ill person to a

211 Conn. 289, 307, 559 A.2d 179 (1989) ("the absence of any language in [General Statutes] § 46b-127 confining the court to the rules of evidence in a hearing to determine probable cause at the transfer stage of [the juvenile court] proceedings is a compelling indication that strict evidentiary standards were not intended to apply in such a proceeding"). Indeed, this lack of procedural requirements, beyond the mandated availability of the family relations report, leads us to conclude that the legislature intended for trial courts to have some discretion to determine the scope of the hearing necessary prior to the initial issuance of a criminal protective order in a family violence case.

Moreover, our construction of § 46b-38c (d) necessarily is informed by the various exigencies faced by a trial court considering whether to grant a criminal protective order in a family violence case. Thus, we emphasize that the legislature did not intend for §§ 54-63c (b) and 46b-38c to entitle a defendant to an evidentiary hearing beyond consideration of the parties' arguments and the family services report prior to the *initial* issuance of a criminal protective order at arraignment, which may well occur within hours of the alleged incident of family violence. See General Statutes § 54-63c (b) (stating only that "defendant is entitled to be heard" at § 46b-38c hearing held at arraignment); see also *State* v. *Doe*, supra, 46 Conn. Sup. 609–10 (procedural due process does not require that defendant receive evidentiary

---

psychiatric facility, the respondent or "his or her counsel shall have the right to present evidence and cross-examine witnesses who testify at any hearing on the application. If such respondent notifies the court not less than three days before the hearing that he or she wishes to cross-examine the examining physicians, the court shall order such physicians to appear."); General Statutes § 19a-343a (e) (action commenced by state to abate public nuisance shall have initial "show cause hearing" for court to "determine whether there is probable cause to believe that a public nuisance exists, and that the circumstances demand the temporary relief requested be ordered," followed by "evidentiary hearing within ninety days from the show cause hearing").

hearing prior to *initial* issuance of criminal protective order or similar condition of release at arraignment). This reflects the potential need for immediate judicial intervention to restore order and safety in the home, as embodied in the legislature's enactment of P.A. 07-123, which allows police officers to impose temporary criminal protective orders as a release condition even prior to the defendant's arraignment. In our view, this limitation also reflects legislative recognition of the heavy flow of judicial business in the busy geographical area courts during arraignment sessions, the press of which is well described by Justice Schaller in his concurring and dissenting opinion. See *People* v. *Forman*, 145 Misc. 2d 115, 128, 546 N.Y.S.2d 755 (1989) ("the emergency nature of the decision, as well as the practical difficulties inherent in convening an immediate evidentiary hearing, mitigate against the imposition of such hearings as constitutionally required before a [temporary order of protection] may first be issued at arraignment").

We agree, however, with the defendant's claims that the extended effects of that initial emergency order may well cause a defendant significant pretrial deprivations of family relations and/or property.[18] This concern,

---

[18] It is undisputed that criminal protective orders may have a significant impact on a defendant's fundamental constitutional rights. See *Williams* v. *State*, 151 P.3d 460, 465 (Alaska App. 2006) (defendant subject to criminal protective order "has a liberty interest in choosing his family living arrangements"); *People* v. *Forman*, supra, 145 Misc. 2d 121 ("Each of the temporary orders of protection restrict [the] defendant's liberty to go where he pleases—he may not go to the home, place of business or place of employment of his wife, as well as his associational liberty in relation to his wife. . . . The orders also exclude him from real property in which [the] defendant otherwise shares ownership and a right to possession." [Citations omitted.]); *Moore* v. *Moore*, 376 S.C. 467, 474–75, 657 S.E.2d 743 (2008) (subject of civil protective order faces, inter alia, "immediate loss of his children . . . and possession of the marital residence," as well as "future ramifications" with "long-term impact" on marital litigation). Moreover, by imposing what some commentators have referred to as "de facto divorce," albeit without the benefit of property division and procedures attendant to the dissolution context, the protective order further compounds the financial difficulties

and the legislature's desire to satisfy the defendant's due process rights under the fourteenth amendment to the United States constitution, is reflected in the comments of the sponsor of the bill enacted as P.A. 07-123, who viewed it as an attempt to "strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens . . . ." 50 H.R. Proc., supra, p. 3904, remarks of Representative Lawlor. Accommodation of this legislative desire to comply with the dictates of due process, and the statutes' silence as to the precise nature of the hearing required; see *Curry* v. *Allan S. Goodman, Inc.*, 286 Conn. 390, 407, 944 A.2d 925 (2008) (" '[w]hen . . . a statutory provision is silent with respect to [the issue at hand], our analysis is not limited by . . . § 1-2z' "); leads us to conclude also that, after a criminal protective order has been issued at arraignment, a defendant is entitled, upon his request made at that time, to a more extensive hearing to be held within a reasonable period of time about the continued necessity of that order. At that second hearing, the state bears the burden of proving,[19] by a fair preponderance of the evidence,

attendant to being tried on criminal charges. See J. Suk, "Criminal Law Comes Home," 116 Yale L.J. 2, 42, 50 (2006) (criminal protective order "amounts in practice to state-imposed de facto divorce" and because it raises "the prospect of punishment for the proxy conduct of being present at home," it "shifts the very goal of pursuing criminal charges away from punishment to control over the intimate relationship in the home"); see also C. Frank, comment, "Criminal Protection Orders in Domestic Violence Cases: Getting Rid of Rats With Snakes," 50 U. Miami L. Rev. 919, 942–43 (1996) ("courts should take seriously the deprivation of the guaranteed right to enjoy property that will result from the issuance of a criminal protection order").

[19] On June 27, 2008, after this case had been argued before the original panel of this court, we ordered the parties to file supplemental briefs addressing the following question: "If this court concludes that an evidentiary hearing is required for the imposition of a domestic violence protective order in a criminal case, should the state be required to prove the necessity of that order by a preponderance of the evidence or by clear and convincing evidence?" Thereafter, both the state and the defendant filed comprehensive

the continued necessity of the criminal protective order in effect since the defendant's arraignment.[20] Cf. *Frizado* v. *Frizado*, 420 Mass. 592, 597, 651 N.E.2d 1206 (1995) (although not expressly provided for by statute, party seeking civil domestic violence protective order must make case for relief by preponderance of evidence); *In re Morrill*, 147 N.H. 116, 117–18, 784 A.2d 690 (2001) (same); *Steckler* v. *Steckler*, 492 N.W.2d 76, 80 (N.D. 1992) (same); *Felton* v. *Felton*, 79 Ohio St. 3d 34, 42, 679 N.E.2d 672 (1997) (same); accord General Statutes § 54-82r (a) (preponderance of evidence standard applies at hearing to determine whether protective order is necessary for witness); *State* v. *Doe*, supra, 46 Conn. Sup. 610 (applying preponderance of evidence standard in criminal protective order case).

With respect to the type of proof required at this subsequent hearing, we further conclude that, inasmuch

---

supplemental briefs in support of the position that, consistent with the procedures followed in civil domestic violence cases in both Connecticut and in other states, the state should be required to prove the necessity of a domestic violence protective order in a criminal case by a preponderance of the evidence.

[20] We emphasize that this subsequent hearing should not be a minitrial on the underlying criminal charges, or, put differently, the state is not required to prove the elements of those crimes charged by a preponderance of the evidence. Indeed, only those defendants charged with crimes punishable by death or life imprisonment have a right to a probable cause hearing in Connecticut. See, e.g., *State* v. *Mitchell*, 200 Conn. 323, 324–26, 512 A.2d 140 (1986) (discussing article first, § 8, of constitution of Connecticut, as amended by article seventeen of amendments); see also *Gerstein* v. *Pugh*, supra, 420 U.S. 119–20 (federal constitution does not require adversary procedures at probable cause proceeding). Thus, once probable cause has been established for the defendant's arrest; see Practice Book § 37-12 (a) (defendant is entitled to probable cause determination within forty-eight hours of warrantless arrest which "shall be made in a nonadversary proceeding, which may be ex parte based on affidavits"); the state's burden is limited to proving by a preponderance of the evidence the necessity of the criminal protective order as a regulatory means for protecting the complainant and other members of the defendant's household. The defendant remains free, however, to adduce his own evidence tending to negate the necessity for the criminal protective order or portions thereof, evidence that may well pertain to the merits of the underlying criminal charges.

as the legislature has not required the introduction of evidence that conforms strictly with the rules of evidence; see *In re Ralph M.*, supra, 211 Conn. 307; the state may, consistent with the defendant's federal due process rights, proceed by proffer, supported by reliable hearsay evidence, and the trial court retains the discretion to determine whether testimony from the complainant or other witnesses is necessary for the order to continue.[21] Cf. *United States* v. *LaFontaine*, 210 F.3d

[21] We note that the defendant does not argue that the confrontation clause of the sixth amendment to the United States constitution requires that he be given the absolute right to examine the complainant at this early stage in the proceedings, particularly if she does not appear to testify on the state's behalf. See *State* v. *Randolph*, 284 Conn. 328, 378–79 n.15, 933 A.2d 1158 (2007) (declining to decide issue, but noting that "majority of states, however, have concluded that the sixth amendment right to confrontation 'is basically a trial right' . . . that does not apply to preliminary hearings" [citation omitted]). To the extent, however, that the defendant claims that his due process rights entitle him to procedural protections beyond those delineated in our interpretation of §§ 54-63c (b) and 46b-38c, namely, a full minitrial, with the right to compel the testimony of and examine the complainant, we disagree. Specifically, we note that several federal courts of appeal have held, following *United States* v. *Salerno*, 481 U.S. 739, 742, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), which upheld the constitutionality of the federal Bail Reform Act, 18 U.S.C. § 3141 et seq., that a defendant facing the even greater liberty restriction of preventive *detention* on the basis of predicted dangerousness is not entitled to those rights as matter of due process. See, e.g., *United States* v. *LaFontaine*, 210 F.3d 125, 130–32 (2d Cir. 2000); *United States* v. *Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996); see also *Harnish* v. *State*, 531 A.2d 1264, 1268 n.8 (Me. 1987) (For the pretrial detention of those charged with "capital" offenses, the court followed *Gerstein* v. *Pugh*, supra, 420 U.S. 120, and concluded that "[t]he pretrial bail proceeding in which the [s]tate makes the required probable cause showing is not to be a mini-trial. The [s]tate may make that showing on affidavits and reliable hearsay as in other pretrial proceedings to determine probable cause."). Indeed, other courts have, consistent with these decisions, concluded that a defendant is not constitutionally entitled to an evidentiary hearing with the right to confront and to cross-examine the complainant prior to the issuance of a criminal protective order in a domestic violence case. See *Mendez* v. *Robertson*, 202 Ariz. 128, 130, 42 P.3d 14 (App. 2002) (rejecting defendant's claim that "he was entitled to an evidentiary hearing on his motion for reexamination of his release conditions, that the respondent judge erred in accepting avowals by the prosecutor, and that [he] should have been permitted to call the victim as a witness so he could cross-examine her"); *People* v. *Koertge*, 182 Misc. 2d 183, 189, 701 N.Y.S.2d 588 (1998) (defendant facing criminal protective order does not have "statutory

125, 130–32 (2d Cir. 2000) (government may proceed by proffer, and defendant's right to call government witness at hearing to revoke bail based on witness intimidation lies within discretion of trial court); *United States* v. *Smith,* 79 F.3d 1208, 1210 (D.C. Cir. 1996) (defendant's sixth amendment confrontation rights were not violated when government proceeded by proffer at preventive detention hearing, and defendant's due process rights were protected by right to counsel, to testify in his own behalf and to proffer testimony of others); see also *State* v. *Doe,* supra, 46 Conn. Sup. 610 (concluding that summons for disorderly conduct and police officer's report constituted sufficient evidence to meet preponderance of evidence standard in criminal protective order case).

Indeed, requiring the evidence admitted at this subsequent hearing to comply with the rigors of the rules

or constitutional right to confront his accuser prior to trial" and due process protection is limited to right to present evidence at bail hearing, at which trial court has discretion to order further evidentiary hearing); *Ex parte Flores,* 130 S.W.3d 100, 107 (Tex. App. 2003) (evidentiary hearing not required for issuance of emergency protective order despite lack of procedure for modification because "the availability of the writ of habeas corpus procedure affords one the opportunity to obtain an adversarial hearing to contest the emergency protective order"), review denied, 2004 Tex. Crim. App. LEXIS 809 (Tex. Crim. App. April 28, 2004); see also *State* v. *Thompson,* 349 N.C. 483, 494, 508 S.E.2d 277 (1998) (discussing *Gerstein* and *Salerno* and stating that Supreme Court "has not required such [adversary hearing] procedures to defeat such a [procedural due process] challenge" in case rejecting facial challenge to statute allowing domestic violence arrestee to be detained for forty-eight hours prior to release conditions hearing before judge); but see *People* v. *Forman,* supra, 145 Misc. 2d 129 ("The requirements of due process do entitle [the] defendant to a prompt evidentiary hearing after the temporary order of protection excluding [the] defendant from the home has been issued. . . . The importance of [the] defendant's interest in his home, the severity of the deprivation imposed through exclusion from the home, and, typically, the need to resolve conflicting issues of fact and credibility as to the underlying family conflict, require that a trial type hearing be provided. Presentation of witnesses and cross-examination are the most suitable means for assessment of veracity and credibility." [Citations omitted.]). Thus, we conclude that the federal due process clause does not entitle the defendant to any procedural protections beyond those articulated in our interpretation of the relevant statutes.

of evidence would be inconsistent with other relevant legislation governing pretrial hearings in criminal cases, including § 54-64f (b), which permits the admission of hearsay or secondary evidence at a hearing to determine whether the defendant has violated the conditions of his release, and § 54-82r (a), which permits the admission of hearsay evidence at a hearing to consider entry of a protective order for benefit of a witness. See footnotes 16 and 10 of this opinion. The defendant may, however, upon the trial court's acceptance of his proffer of relevant evidence regarding the continued necessity of the protective order, testify or present witnesses on his own behalf, and may cross-examine any witnesses whom the state might elect to present against him.[22] This defense evidence, along with the comprehensive initial proffer and the submission of evidence by the state, further will ensure that there will be a record adequate to review, on an expedited basis under General Statutes § 54-63g,[23] the trial court's ruling with respect to the continued necessity of the criminal protective order.

Accordingly, we conclude that §§ 54-63c (b) and 46b-38c permit the trial court to issue a criminal protective

---

[22] Should the trial court, in the exercise of its sound discretion, deem it necessary for the complainant or children to testify, we note that such testimony may be taken and the witness cross-examined in a manner intended to address concerns, expressed herein by the state and the amici curiae, Connecticut Coalition Against Domestic Violence, office of the victim advocate and department of children and families, as well as both Justices Palmer and Schaller in their dissents, about the potential intimidation of testifying complainants and children. Cf. Public Acts 2008, No. 08-67, § 1, codified at General Statutes § 46b-15c (authorizing court to order sworn testimony in family relations matter by party or child who is subject of protective order, when other party is subject of protective order, to be taken via videoconference technology with witness either outside courtroom or in remote location).

[23] General Statutes § 54-63g provides: "Any accused person or the state, aggrieved by an order of the Superior Court concerning release, may petition the Appellate Court for review of such order. Any such petition shall have precedence over any other matter before said Appellate Court and any hearing shall be heard expeditiously with reasonable notice."

order at the defendant's arraignment after consideration of oral argument and the family services report.[24] We also conclude that the trial court is required to hold, at the defendant's request made at arraignment, a subsequent hearing within a reasonable period of time wherein the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay, and the defendant will have the opportunity to proffer relevant evidence to counter the state's case in support of the criminal protective order through his own testimony or that of other witnesses.[25] On the record of the present consolidated appeal, Judge Pavia did not need to conduct an immediate evidentiary hearing when she issued the initial criminal protective order at the defendant's arraignment. Rather, Judge Pavia properly set the matter down for a hearing three days later. At that time, however, Judge Bingham improperly concluded, as a matter of law, and, we acknowledge,

[24] Justice Schaller expresses concern about the uncertainties that might develop during the implementation of this procedure, namely, the definition of terms such as "reasonable time," and whether the arraignment court must inform the defendant of his right to the subsequent hearing. We acknowledge the impracticability of addressing in dicta every possible dispute that might arise during the implementation of this, or any other, judicial decision, and note that many such concerns are best addressed either through the rule-making process or the development of future case law.

[25] Justice Schaller argues in his dissent that our conclusion is "unwise policy" because, given the "unique kind of vulnerability" of family violence victims, the likelihood of examination and cross-examination at an early stage in the proceedings will deter them from pursuing criminal complaints against their abusers. We acknowledge Justice Schaller's observations about the unique concerns of those involved in family violence cases, and emphasize that the state is not required to call a family violence complainant to testify at the subsequent hearing, and the trial court retains considerable discretion about whether to grant such a request by the defendant. To the extent that a defendant does "proffer [a] highly damaging [challenge]" to a complainant's account, "virtually compelling the state to call victims in order to prove the necessity of continuing the order," that concern is dependent solely on the trial court's assessment of the credibility of the defense. Moreover, should the trial court in its discretion deem the complainant's testimony necessary prior to the issuance of a criminal protective order, statutory mechanisms exist to facilitate that testimony in a manner that will mitigate intimidation concerns. See footnote 22 of this opinion.

without benefit of this opinion, that the defendant was not entitled to any kind of hearing beyond that which he already had received before either himself or Judge Pavia.[26] Accordingly, on remand, the defendant is enti-

---

[26] In his dissent, Justice Palmer argues that we should affirm the judgment of the trial court because the defendant failed to argue before the trial court in support of the particular conclusion of law that we adopt herein, and argued only that he was entitled to a full, trial-like, evidentiary hearing. We agree, however, with Justice Schaller that Justice Palmer's position represents a hypertechnical and unduly restrictive application of the rules of preservation, which we acknowledge "generally limit this court's review to issues that are distinctly raised at trial." (Internal quotation marks omitted.) *Rowe* v. *Superior Court*, 289 Conn. 649, 660, 960 A.2d 256 (2008). On this point, like Justice Schaller, we find persuasive the analysis from our recent decision in *Rowe*, wherein we concluded that trial counsel had preserved for appellate review via writ of error his claim that a second finding of criminal contempt, based on a witness' refusal to answer subsequent and rephrased questions on the same topic, violated the common law. Id., 662–63. We noted in *Rowe* that we were "mindful that [although] the plaintiff did not raise [before the trial court] all of the theories that he raises in his writ as to why his conduct should be deemed a single act of contempt, those theories are related to a single legal claim," and that there is "substantial overlap between these theories under the case law." Id., 663. Accordingly, we concluded that "we [could not] conclude that the plaintiff has ambushed the trial court by seeking reversal of an issue that he had failed to raise at trial." Id., 662–63; see also id., 661 n.6 (declining to construe ambiguity in record against plaintiff-in-error because of "summary nature of the proceedings and the fact that this issue is one of first impression"). Indeed, we also noted in *Rowe* that the concerns of judicial economy implicated by appeals by ambuscade, namely, that new trials would be required, were not implicated because "success on the writ would not require a new trial." Id., 661 n.6.

A review of the applicable transcript reveals that a reversal in this interlocutory public interest appeal does not operate as a judicial ambush of Judge Bingham, as, after he denied the defendant a full, trial-like hearing, defense counsel questioned him about the nature of the hearing to which the defendant was entitled. Defense counsel also pointed out that the state had not shown him any supporting affidavits, notwithstanding the fact that the defendant himself did not make a proffer in support of his request to call witnesses. Finally, a reversal here would not frustrate judicial economy, as the case has not been tried, and no evidence has been admitted in this pretrial hearing; this appeal, therefore, concerns solely a proposition of law that requires the defendant to receive what likely will be a brief hearing.

Indeed, for a more complete understanding of what took place before Judge Bingham, we note in detail that, during argument, the following exchange occurred between Judge Bingham and defense counsel.

"The Court: Well . . . you're not entitled to a full hearing, with the right to subpoena witnesses and the right to call the wife. This puts an undue burden on the wife because she has—and the affidavits, evidently, indicate

that the wife is afraid of the husband and that she requested a full protective order. And you're not entitled to a full trial here in this court. . . .

"[Defense Counsel]: *If I may then, Your Honor, if we're doing it today, I would point out to the court that we've been shown no affidavits.*" (Emphasis added.)

After further argument on the legislature's intent, the following exchange occurred between the prosecutor, the court and defense counsel.

"[The Prosecutor]: . . . [W]e don't do this arbitrarily and cavalierly. We have pictures; this is a documented case. This is not something that we're just saying it's a credibility issue, here. There's plenty of facts that substantiate probable cause that the police found to make an arrest, and certainly the issuance of a protective order. That's all I have to say, Your Honor. And, counsel, if the Appellate Court agrees with you, then the state will, in the future—will comply with any evidentiary hearing the court deems fit.

"The Court: Well—

"[The Prosecutor]: I'm going to ask for a continuance, Your Honor. We can put it on the regular docket. I think counsel's been heard in our argument. I think it's essentially a legal argument, Your Honor. The court would certainly be leaving—we issue, literally, hundreds and hundreds of these a week, Your Honor. And I'm not saying court efficiency or court economy is the determinant fact here, but the court understands the type of argument counsel is making. He's saying that, essentially, we have a little minitrial before we have another trial, to determine whether this happened. The court makes decisions like this all the time, and not just only domestic violence cases. The fact that she's a woman, believe me, plays no determination in this whatsoever for the state's opinion on this case. It has nothing to do with it.

"[Defense Counsel]: I can only act on the basis of what I've heard in this courtroom, counsel.

"The Court: Well, my ruling is that you are not entitled to a full trial, with the ability to subpoena witnesses and have a full trial.

"[Defense Counsel]: *May I know, then, Your Honor's interpretation of the nature of the hearing that we are, then, permitted under § 46b-38c, as referenced in Public Act 07-123?*

"The Court: *We gave you a right to be heard today.*

"[Defense Counsel]: *How, Your Honor, when I have heard no evidence against my client except statements which are not under oath? There [are] no facts before the court* when, in fact, the Public Act itself states that the . . . protective order—issued by the police remains only in effect until the presentment under § 54-1g, the arraignment statute, which was Monday, at which time there has to be a hearing. Well, if the hearing is simply the state saying, 'we want a restraining order,' and they submit to the court the report of the family—or the domestic violence response unit, what hearing is that?

"[The Prosecutor]: That's the hearing you're entitled to, counsel.

"[Defense Counsel]: Oh.

"[The Prosecutor]: *And if counsel has to—wants to put in a hearing right now, say that he has reason to believe the credibility and the statements of the victim, or the Gerstein of the credibility of the police officers that responded, I'd like to hear that, myself, because the state's interest here is to do justice. If this was a situation where there was—you know, things that were manufactured—*

"[Defense Counsel]: *Well, that's—*

"[The Prosecutor]: I'd like to hear it.

"[Defense Counsel]: —*that's*—

"[The Prosecutor]: I'm certainly—my own eyes, I met with the victim today, Your Honor, and I see bruises all over her body; so based on the statements that the police officers gave me when they made the arrest, I have reason to believe that an assault took place, here. And that's what we do here on a daily basis, counsel. And I guess you're going to have to meet with your local legislat[ors] to maybe, you know, change the law. . . .

"The Court: Well, *the argument of counsel for the defendant I don't accept,* and I am adopting the procedure which has been—this is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing. So, you may have an appeal . . . .

"[Defense Counsel]: We filed the appeal already, Your Honor." (Emphasis added.)

Although we acknowledge the importance of preservation requirements to an orderly system of appellate review, it appears that Justice Palmer would conclude that a reviewing court may consider only those specific *arguments* made before the trial court on the given *issue*, namely, what type of hearing is required under § 46b-38c, or subject of a dispute, and also is required to accept an appellant's arguments in their entirety before granting any relief at all. Put differently, adopting Justice Palmer's restrictive application of those requirements would frustrate a reviewing court's ability to address claims on appeal appropriately and effectively because that court would be precluded from granting partial relief unless the appellant has elected to proceed in the alternative before the trial court and ask specifically for that partial relief before that court, prior to repeating those arguments verbatim on appeal. Thus, we disagree with Justice Palmer's view that we apply preservation principles in this case in an "expansive" manner "never before . . . adopted . . . ." Expressed in the symbolic language that Justice Palmer uses to illustrate his misunderstanding of this opinion, we simply state that, if a defendant asks for relief at the trial court that encompasses elements A, B, C and D, that request is adequate to permit relief on appeal that only grants elements A and B, but not C and D. Under Justice Palmer's view, a defendant would need to argue explicitly that, "if I'm not entitled to A, I am still entitled to B, C and D," and "if I'm not entitled to A and B, then I am still entitled to C and D," and so on, in order to render that relief available on appeal. That strikes us as an unduly onerous burden on litigants. Moreover, we disagree with Justice Palmer's reliance on case law concluding that evidentiary claims were not properly preserved. See *State* v. *Cabral,* 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005); *State* v. *Meehan,* 260 Conn. 372, 388–89, 796 A.2d 1191 (2002). Evidentiary rulings are subject to a preservation and briefing standard under Practice Book §§ 5-5 and 67-4 (d) (3) that reflects the discretionary nature of those decisions, as compared to questions of law such as that present in this case, which are subject to plenary review. See *State* v. *Cabral,* supra, 530–31 ("[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted."

tled to the opportunity to request, and to receive, an evidentiary hearing as described in the preceding paragraph about the continued necessity of the criminal protective order.

The order in Docket No. SC 18103 is affirmed. The order in Docket No. SC 18045 is reversed and the case is remanded for further proceedings in accordance with the preceding paragraph.

In this opinion ROGERS, C. J., and VERTEFEUILLE, ZARELLA and McLACHLAN, Js., concurred.

SCHALLER, J., concurring and dissenting. I disagree with the majority that General Statutes §§ 54-63c (b),[1] and 46b-38c,[2] require that the trial court hold, upon a defendant's request during the hearing to which he is statutorily entitled at his arraignment, a second hearing at which the state must prove by a preponderance of the evidence the continued necessity of a criminal protective order issued pursuant to § 54-63c (b). Because I conclude that the defendant, Fernando A., has no statutory right to such a hearing, I also address the defendant's constitutional claim, and conclude that the defendant's right to procedural due process, as guaranteed by the fourteenth amendment to the United States constitution, is not violated by the current practice in the trial court, in accordance with §§ 54-63c (b) and 46b-38c, of issuing a protective order following a hearing at

[Internal quotation marks omitted.]); *State* v. *Meehan*, supra, 388 (noting discretionary nature of evidentiary ruling).

In our view, a more functional approach to preservation acknowledges the tension that exists between decision making by busy trial courts, which, as Justice Schaller acknowledges, frequently must occur at a rapid pace, and decision making by appellate courts, which often have available to them the luxury of a more comprehensive briefing process, as well as ample time to engage in a more thorough argument, research and writing process prior to issuing an opinion.

[1] For the text of § 54-63c (b), see footnote 2 of the majority opinion.

[2] For the text of § 46b-38c, see footnote 4 of the majority opinion.

the time of the defendant's arraignment, at which the trial court has available to it the report prepared by the family violence intervention unit and at which the defendant has the right to present oral argument.[3]

In accordance with existing practice pursuant to §§ 54-63c (b) and 46b-38c, the defendant, who stands charged with a family violence crime, and against whom a protective order had issued, was provided with a hearing at the time of his arraignment. That hearing was sufficient to satisfy both the requirements of our state statutes and federal procedural due process. In my view, the majority's interpretation of §§ 54-63c (b) and 46b-38c to require an expanded, *second* hearing for the benefit of defendants in family violence cases is not grounded in existing state or federal law. While, upon close examination, this expanded hearing requirement does not appear to make any dramatic changes to the existing state of the law, pursuant to which trial courts presumably have discretion to do—or decline to do—everything authorized by the majority decision, I believe that the new procedure will cause more problems than it will solve. I write separately to emphasize several aspects of my disagreement with the majority.[4]

---

[3] As the majority explains in footnote 3 of its opinion, this appeal is the consolidation of two separate proceedings. The appeal in Docket No. SC 18103 challenges the order of the trial court, *Pavia, J.*, on the day of the defendant's arraignment, denying the defendant's request for an immediate evidentiary hearing and continuing the case for three days so that the defendant could then request an evidentiary hearing. The majority affirms the order of the trial court in Docket No. SC 18103, and I concur in that result.

The appeal in Docket No. SC 18045 challenges the subsequent order of the trial court, *Bingham, J.*, denying the defendant's request for an evidentiary hearing. For the reasons discussed in this concurring and dissenting opinion, I disagree with the majority's decision to reverse the order of the trial court in Docket No. SC 18045.

[4] I disagree with Justice Palmer's conclusions that the defendant failed to preserve his claim, that the trial judge should be affirmed rather than reversed, and that the majority is unfairly ambuscading the trial judge. *Rowe v. Superior Court*, 289 Conn. 649, 960 A.2d 256 (2008), is established law and I believe it is clear that the defendant preserved the claim that he pursues on appeal, which the majority resolves. I submit that the concept

Because the nature of the newly created right to some extent guides my analysis, I begin by outlining the contours of the hearing to which the majority concludes the defendant is entitled. The majority concludes that a defendant charged with a family violence crime has a statutory right under § 54-63c (b) to what I would characterize as a qualified or *conditional evidentiary hearing*, at his request, after the arraignment stage.[5] As I understand it, the expanded, second hearing consists of the following steps: (1) the defendant must request

of preservation should be liberally interpreted to allow a claim to proceed to a decision on the merits. In the present case, the defendant notified the court and the state that he was seeking a second hearing—an expanded one, which he characterized as a "trial-like hearing . . . ." Although no one could foresee the precise procedure that the majority would announce today, the state and the trial court were on notice that the defendant sought an expanded second hearing. The trial court's ruling certainly was not incorrect under the circumstances but, because it did not grant the second hearing outlined today, a reversal is in order. The majority has acknowledged that the trial court was not mistaken because it did not have the benefit of this decision. Clearly, the majority's decision has changed the law to a degree. Trial judges—like all participants in court proceedings—deserve to be treated respectfully and fairly by appellate courts, but trial judges need not be *sheltered* from reversal, when warranted. I suggest that the concept of *ambuscade of the trial judge* is often overemphasized generally and, certainly, it is misplaced under these circumstances. A far greater concern is *ambush* of a *party* when that party is deprived of a fair chance to defend a claim at the trial level and create a record for appeal. That did not happen in the present case.

[5] It is unclear whether and, if so, by what analysis, the majority concludes that the defendant has a procedural due process right to an evidentiary hearing after the arraignment stage. The majority suggests that it bases its conclusion that the defendant is entitled to a second, expanded hearing on state statutory grounds, and further suggests that it has not considered whether the defendant's right to procedural due process under the federal constitution requires the new rule. The majority's statutory analysis, however, is based entirely on its reliance on the notion that the legislature desired to protect the due process rights of family violence defendants. As I observe in part I of this concurring and dissenting opinion, by concluding, in the context of its statutory analysis, that due process *impliedly* requires the second, expanded hearing, the majority forgoes the opportunity to explain the precise reasoning that apparently has led it to conclude that procedural due process requires this result.

the second hearing at the initial arraignment hearing that is provided for in § 54-63c (b); (2) the second hearing must be held within a reasonable time after the request and is to be "more extensive" than the arraignment hearing; (3) the state bears the burden of proving the continued necessity of the original order by a fair preponderance of the evidence; (4) the "evidence" proffered by the state may include reliable hearsay and need not "comply with the rigors of the rules of evidence"; (5) the trial court "retains"—as it presently does—discretion to determine whether testimony from the "complainant or other witnesses" is "necessary" for the order to issue; (6) if the state is permitted to present witnesses, the defendant may cross-examine them; and (7) the defendant has no unconditional right to present evidence but may "proffer relevant evidence" challenging the continued necessity of the protective order.

Depending on the trial court's discretion, the defendant may be allowed to testify and present witnesses. The defendant's only unconditional right, aside from cross-examining state's witnesses, is to proffer relevant evidence, not to present it. In sum, under the new rule created by the majority, the defendant has no federal constitutional or state statutory right to an evidentiary hearing. In other words, according to the majority, neither due process nor the relevant statutes—§§ 54-63c (b) and 46b-38c—require more than the expanded hearing that I have set forth, which allows for complete discretion on the part of the trial court as to whether and to what extent evidence may be presented by either party. The hearing is evidentiary only as to the right of the parties to make proffers of evidence and to call witnesses or submit other evidence to the extent permitted by the trial court.

Assuming that my understanding of the majority opinion is correct, my disagreement is limited to the following points. The decision to create a special hearing, to

which defendants who are charged with the commission of a family violence crime are entitled upon request, is: (1) inconsistent with the statutory scheme set forth in §§ 54-63c (b) and 46b-38c; (2) not mandated by the federal due process clause; and (3) unwise and unnecessary because of various prudential and policy concerns. Such concerns include my view that the decision is: (1) unfair to defendants in other criminal cases, because it singles out family violence defendants for special treatment; (2) unwise, because it does not take into account the special vulnerability of victims of family violence and undermines the efforts that the legislature has made to protect these victims; (3) unworkable, because it burdens already busy trial courts and provides only conflicting and confusing guidance; and (4) unnecessary, because trial courts already have the discretion to order, on a case-by-case basis, what the majority now holds is the defendant's right upon request.

I

The only question raised in the defendant's statutory claim is the meaning of the word "hearing" as used in §§ 54-63c (b) and 46b-38c,[6] an issue that the majority acknowledges presents a question of statutory interpretation. The majority infers from the absence of express statutory language in §§ 54-63c (b) and 46b-38c specifying the nature and scope of the hearing to which the defendant is statutorily entitled that the statutes are ambiguous as to that issue. I disagree. The absence of express language, without more, is simply not sufficient to give rise to ambiguity. Instead, in interpreting the

---

[6] Section 46b-38c (e) uses the word "hearing" with reference to the language that must be included in a protective order "made in accordance with [§ 46b-38c] after notice and hearing," and provides that such order must state: " 'This court had jurisdiction over the parties and the subject matter when it issued this protection order. Respondent was afforded both notice and opportunity to be heard in the hearing that gave rise to this order.' "

term "hearing" in the statutes, and determining whether the statutory language is ambiguous, our question, as always, is whether there exists more than one reasonable interpretation of the language. *Bender* v. *Bender*, 292 Conn. 696, 708–709, 975 A.2d 636 (2009) ("[t]he test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation" [internal quotation marks omitted]). We also must be mindful of the "basic tenet of statutory construction that [w]e construe a statute as a whole and read its subsections concurrently in order to reach a reasonable overall interpretation." (Internal quotation marks omitted.) *Barry* v. *Quality Steel Products, Inc.*, 280 Conn. 1, 9, 905 A.2d 55 (2006). Accordingly, the meaning of the word "hearing" properly must be understood by looking at the term in the context of the entire statutory scheme. I turn, therefore, to §§ 54-63 (b) and 46b-38c.

Section 54-63c (b) provides in relevant part that "[a]ny nonfinancial conditions of release imposed pursuant to this subsection shall remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54-1g. On such date, *the court shall conduct a hearing pursuant to section 46b-38c at which the defendant is entitled to be heard with respect to the issuance of a protective order.*" (Emphasis added.) What is clear from the face of the statute is that the hearing is intended to be held at the time of the defendant's arraignment; the nature of the hearing must be understood with reference to § 46b-38c; and, at the hearing, the defendant has the right "to be heard . . . ." General Statutes § 54-63c (b). Section 46b-38c establishes family violence response and intervention units to respond to complaints of family violence. In family violence cases, those units are responsible for "prepar[ing] written or oral reports on each case for the court by the next court date to be

presented at any time during the court session on that date . . . ." General Statutes § 46b-38c (c) (2). These reports "shall be available to a judge at the first court date appearance to be presented at any time during the court session on that date," and upon considering the report at the hearing, the court may issue a protective order. General Statutes § 46b-38c (d). Section 46b-38c reveals that the hearing is intended to give the court the opportunity to review the report prepared by the family violence intervention unit, and to determine, on the basis of that report, whether to issue a protective order.

Sections 54-63c (b) and 46b-38c, read together, further reveal that the hearing guaranteed to the defendant in the statutory scheme cannot have been intended to be a full evidentiary hearing. The single most significant piece of information that leads to this conclusion is that the legislature contemplated that the hearing would take place at the time of the arraignment; see General Statutes § 54-1g;[7] which the majority acknowledges occurs very shortly after the arrest. At that point in the defendant's criminal case, there will have been scarcely any time to begin an investigation into the evidence, let alone prepare for a full evidentiary hearing. In some cases, a defendant is initially assigned counsel at the time of arraignment. Moreover, arraignments commonly take place during the daily criminal session of short matters, during which the court deals with a wide variety of matters, including new arrests and arraignments, continued cases that have been assigned for

[7] General Statutes § 54-1g (a) provides: "Any arrested person who is not released sooner or who is charged with a family violence crime as defined in section 46b-38a or a violation of section 53a-181c, 53a-181d or 53a-181e shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed. If an arrested person is hospitalized, or has escaped or is otherwise incapacitated, the person shall be presented, if practicable, to the first regular sitting after return to police custody."

plea, appointment of counsel, short motions and bail modifications, among others. In small geographical areas, one judge might handle the entire criminal docket, including these matters. In large geographical areas, one of several judges assigned to criminal matters may deal with the arraignment docket. At the opening of court, the arraignment judge advises the defendants who are scheduled to be arraigned that day of their rights and then arraigns each defendant individually. At some point during this busy session, which takes place so soon after the defendant's arrest, a defendant arrested on a family violence charge is given the hearing to which he is entitled under §§ 54-63c (b) and 46b-38c. These conditions hardly are conducive to holding a full evidentiary hearing. Rather, as the majority recognizes, the circumstances under which the legislature envisioned a hearing pursuant to §§ 54-63c (b) and 46b-38c to take place particularly require "the need for expeditious assumption of judicial control . . . . *State* v. *Doe*, [46 Conn. Sup. 598, 609, 765 A.2d 518 (2000)]." (Internal quotation marks omitted.) Surely, the legislature is aware of the nature of arraignment proceedings, and its provision of a right to a hearing *at arraignment* must be understood to provide the right to a hearing with an extent and scope appropriate for and possible in that context.

Moreover, as I have noted, the purpose of the hearing provided for in § 54-63c (b) is set forth in § 46b-38c. That purpose supports the conclusion that the hearing is intended to be fairly limited in scope. Specifically, the hearing provides the court an opportunity to review the report prepared by the family violence intervention unit and, following oral argument if the defendant exercises his statutory right to be heard, to determine whether to issue a protective order. The legislative intent to provide a hearing of limited scope is further supported, as Justice Palmer points out in his dissent,

by the provision in § 46b-38c (e) that such protective orders "shall be made a condition of the bail or release of the defendant . . . ." General Statutes § 46b-38c (e). I agree that this constitutes strong evidence that the legislature intended for hearings pursuant to § 54-63c (b) to have a similar scope and extent as a bail hearing.

The majority's own statutory analysis lends further support to this conclusion. The majority correctly points out that a defendant who wishes to challenge a protective order that is issued following a hearing pursuant to § 54-63c (b) is not without a remedy. Such a defendant is always free to seek a modification of the protective order pursuant to General Statutes § 54-69.[8] Additionally, even in the absence of any subsequent hearing on a motion for modification, the defendant will have the right to a full hearing if he elects to go to trial. It is appropriate to view § 54-63c (b) as what it is—a temporary measure intended to protect the victim until the ultimate resolution of the charges brought against the defendant.

The majority makes two additional points that support the conclusion that the plain and unambiguous

---

[8] General Statutes § 54-69 (a) provides: "Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney or assistant state's attorney *or the accused person* may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses *continue, modify or set conditions of release* upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary." (Emphasis added.)

meaning of §§ 54-63c (b) and 46b-38c is that the defendant is statutorily entitled only to a brief hearing to be held at arraignment, during which the defendant simply has the right to be heard, and not to present evidence. First, the majority relies on the principle that the legislature is presumed to be aware of a judicial interpretation that has been placed upon a statute. *Charles* v. *Charles*, 243 Conn. 255, 262, 701 A.2d 650 (1997), cert. denied, 523 U.S. 1136, 118 S. Ct. 1838, 140 L. Ed. 2d 1089 (1998). The majority acknowledges that the Superior Court, in *State* v. *Doe*, supra, 46 Conn. Sup. 598, "relied on *Gerstein* v. *Pugh*, 420 U.S. 103, 119, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975), and concluded that a hearing held pursuant to § 46b-38c, at which the defendant did not have the opportunity to cross-examine the complainant prior to the issuance of a criminal protective order in a family violence case, did not violate the defendant's due process rights because it was a bail related hearing that required the need for expeditious assumption of judicial control . . . . *State* v. *Doe*, supra, 609." (Internal quotation marks omitted.) The majority reasons that the legislature presumably was aware of *Doe* when it amended § 54-63c (b) in 2007; Public Acts 2007, No. 07-123; yet the legislature did not amend the statute to require a full evidentiary hearing, or even an expanded hearing such as the majority now concludes is required.

Second, the majority points out that in other criminal statutes, when the legislature has intended to impose specific procedural requirements in the context of a pretrial hearing, it has done so explicitly. See, e.g., General Statutes § 54-82r (authorizing issuance of protective order prohibiting harassment of witness following hearing at which hearsay evidence is admissible; requiring finding of harassment and necessity of protective order supported by preponderance of evidence; and granting adverse party right to present evidence and cross-examine witnesses); General Statutes § 54-64f

(upon finding of probable cause that defendant violated conditions of release, court may hold evidentiary hearing at which hearsay evidence is admissible; violation must be proven by clear and convincing evidence). The majority draws the proper inference from the comparison, reasoning that the lack of procedural requirements for the hearing provided for in § 54-63c (b) indicates that the legislature did not intend to impose such requirements. I agree. The majority's rational and thorough discussion of the statutory language and its ordered application of traditional statutory interpretation principles lead logically to the same conclusion that I arrive at—the legislature did not intend that the hearing provided for in § 54-63c (b) would be an evidentiary hearing. I emphasize that the majority does not state anywhere in its analysis that the legislature intended, through §§ 54-63c (b) and 46b-38c, to entitle family violence defendants to a second, expanded hearing. Nor does it state that the word "hearing" reasonably may be so interpreted. Indeed, the majority cannot, because it has acknowledged that the meaning of the word "hearing" in §§ 54-63c (b) and 46b-38c—which, as I stated earlier in this opinion, is the *only* issue presented by the defendant's statutory claim—is exactly as the trial court, *Bingham, J.*, interpreted it in denying the defendant's request for a full evidentiary hearing. That is, the word "hearing" in §§ 54-63c (b) and 46b-38c signifies a brief hearing held at the time of the defendant's arraignment, at which the court will review the report of the family violence intervention unit and hear oral argument from the defendant if he so desires, to assist the court in determining whether to issue a protective order. At this point, my analysis would end, as dictated by General Statutes § 1-2z, because the plain and unambiguous language of §§ 54-63c (b) and 46b-38c leads to the conclusion that the defendant was statutorily entitled to the hearing that he received—no more, no less.

The majority, despite the dictates of § 1-2z, relies on legislative history to support its decision to create a new rule entitling family violence defendants to a second, expanded hearing. At this point in the majority opinion, it is difficult to discern precisely how the majority grounds its analysis on principles of statutory interpretation. The first problem, of course, is that the majority engages in this part of its analysis after acknowledging that the intent of the legislature with regard to the scope of the hearing to which the defendant is entitled at his arraignment is clear. In fact, the majority begins this portion of its analysis by acknowledging that a full evidentiary hearing would be impractical at the defendant's arraignment. As I have stated in this concurring and dissenting opinion, this impracticality leads to the conclusion that the legislature intended the hearing to be brief and nonevidentiary in nature. The majority, however, reasons that the necessary brevity of the hearing intended by the legislature "may well cause a defendant significant pretrial deprivations of family relations and/or property." The potential of these deprivations is what underlies the majority's "statutory" analysis.

Specifically, in support of this entirely new rule, purportedly arrived at through the process of statutory interpretation—a process that, by the majority's own admission, when applied to the statutory language itself, yields the conclusion that the legislature intended to impose no procedural requirements on the arraignment hearing guaranteed by §§ 54-63c (b) and 46b-38c—the majority points only to a vague statement, made on the floor of the House of Representatives, that the statute attempts to " 'strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens . . . .' 50 H.R. Proc., [Pt. 12, 2007 Sess.], p. 3904, remarks of Representative [Michael P.] Lawlor." The majority asserts that

this statement reflects a "legislative desire to comply with the dictates of due process . . . ." The legislature, however, is *always* assumed to desire, and to be obligated, to comply with due process. That statement, then, has no special significance in the sense that the majority relies on it.[9] In any case, the majority relies on the principle that a defendant's due process rights must be protected, and the fact that the statutes do not expressly define the parameters of the word hearing, to infer that the new rule creating the expanded, second hearing is justified. This reasoning requires that the reader completely ignore the majority's statutory analysis, which ably interpreted the plain language of the statutes to discern that the legislature made clear that the hearing at arraignment is intended to allow consideration of the report prepared by the family violence intervention unit and any oral argument the defendant may choose to offer. Those are the parameters of the hearing to which the defendant is entitled pursuant to §§ 54-63c (b) and 46b-38c. Nothing is unclear about the precise nature of this hearing. It is simply not the hearing that the majority believes the legislature should have provided.

Based on the majority's single justification for its statutory interpretation, I can conclude only that, without directly saying so, the majority, in actuality, grounds its conclusion not on a statutory analysis, but on an implicit determination that due process requires the creation of this new right to an expanded, second hearing. I therefore turn to the question of whether the

[9] Interestingly, the majority does not draw the more obvious inference from Representative Lawlor's statement—that providing the defendant with the brief, nonevidentiary hearing to which he is entitled pursuant to §§ 54-63c (b) and 46b-38c at the time of his arraignment, strikes that "delicate balance . . . ." 50 H.R. Proc., supra, p. 3904. In other words, the logical inference to be drawn from Representative Lawlor's words is that the statutes do not deprive the defendant of his right to due process and, on the contrary, properly balance those rights against the legitimate interests of law enforcement.

defendant is entitled pursuant to his right to procedural due process to more than is statutorily mandated by §§ 54-63c (b) and 46b-38c.

## II

The United States Supreme Court, in determining whether an individual's right to procedural due process has been violated by a state action, employs two distinct tests, depending on whether the claim arises in the civil or criminal context. In the civil context, the court applies the three part balancing test that it first set forth in *Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).[10] In the criminal context, as in the present case, a state rule of criminal procedure will be held to violate a defendant's right to due process *only if* the procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Internal quotation marks omitted.) *Medina* v. *California*, 505 U.S. 437, 445, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992). In order to meet his burden of showing a violation of the right to procedural due process in the criminal context, a defendant must show that there is a "historical basis"[11]

---

[10] In *Mathews* v. *Eldridge*, supra, 424 U.S. 334-35, the court adopted a three part balancing test for resolving procedural due process claims, explaining "that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." The court considered this balancing test to be particularly well adapted to the concept of due process, which, the court stated, "is flexible and calls for such procedural protections as the particular situation demands." (Internal quotation marks omitted.) Id., 334.

[11] See S. Brauerman, comment, "Balancing the Burden: The Constitutional Justification for Requiring the Government to Prove the Absence of Mental Retardation Before Imposing the Death Penalty," 54 Am. U. L. Rev. 401, 425-26 (2004) ("[o]nce the [c]ourt recognizes a due process right, it applies either the *Patterson* . . . 'historical basis' test *or* the *Mathews* . . . 'balancing test' " [emphasis added]).

for his claim that a state procedure violates a fundamental principle of justice. Id., 448.

Although this court has in the past unquestioningly applied the *Mathews* test in the criminal context; see, e.g., *State* v. *Patterson*, 236 Conn. 561, 572–76, 674 A.2d 416 (1996) (applying *Mathews* test to conclude that there is no federal due process right to presentence investigation report); *State* v. *Lopez*, 235 Conn. 487, 493–97, 668 A.2d 360 (1995) (applying *Mathews* factors in concluding no per se right to evidentiary hearing on state's motion to rectify transcript); *State* v. *Joyner*, 225 Conn. 450, 471, 625 A.2d 791 (1993) (*Mathews* test applicable to due process issues under state constitution); see also *State* v. *Kelly*, 256 Conn. 23, 85, 770 A.2d 908 (2001) (citing *Mathews*, but not applying balancing test to claim that trial court improperly denied defendant's parents and fiancée opportunity to speak at his sentencing in violation of his constitutional rights to due process and effective assistance of counsel); *State* v. *Misiorski*, 250 Conn. 280, 294–96, 738 A.2d 595 (1999) (*Berdon, J.*, dissenting) (applying *Mathews* factors in concluding that judicial hearing is required before probation officer may disclose defendant's criminal record to community pursuant to Megan's Law, General Statutes [Rev. to 1997] § 54-102s); I believe that this represents a mistaken application of federal constitutional law. To elucidate why *Medina* rather than *Mathews* governs the defendant's due process claim, it is helpful to review the applicable United States Supreme Court and federal court precedent. In *Medina* v. *California,* supra, 505 U.S. 442–43, the United States Supreme Court expressly disavowed the application of the balancing test it had set forth in *Mathews* to evaluate procedural due process claims in the criminal context, stating that *Mathews* does not provide the "appropriate analytical framework"; id., 443; to address a criminal defendant's procedural due process claim. The court explained the

reason for this departure from the *Mathews* test, which had, until that point, been understood to apply generally to all procedural due process claims: "In the field of criminal law, we have defined the category of infractions that violate fundamental fairness *very narrowly* based on the recognition that, [b]eyond the specific guarantees enumerated in the [b]ill of [r]ights, the [d]ue [p]rocess [c]lause has limited operation." (Emphasis added; internal quotation marks omitted.) Id. The court explained that "[t]he [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause [would invite] undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." Id. Moreover, the court recognized that its role in interpreting and upholding the due process clause does not "establish this [c]ourt as a rulemaking organ for the promulgation of state rules of criminal procedure." (Internal quotation marks omitted.) Id., 443–44. Additionally, the court was particularly aware of the fact that "because the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area." Id., 445–46. Instead, in the criminal context, the "proper analytical approach . . . is that set forth in *Patterson* v. *New York*, 432 U.S. 197 [97 S. Ct. 2319, 53 L. Ed. 2d 281] (1977)." *Medina* v. *California*, supra, 445.

In *Patterson* v. *New York*, supra, 432 U.S. 201, the United States Supreme Court had rejected the claim that allocating to the defendant, who had been charged with murder, the burden of proving the affirmative defense of extreme emotional disturbance by a preponderance of the evidence, violated the defendant's right

to procedural due process as guaranteed by the fourteenth amendment. Id. In the arena of criminal law, the court observed, "[t]raditionally, due process has required that only the most basic procedural safeguards be observed; more subtle balancing of society's interests against those of the accused have been left to the legislative branch." Id., 210. In addressing the defendant's claim that the burden allocation violated his right to procedural due process, the court examined the historical origins and development of the rule, stating that a state's decision regarding how to "regulate procedures under which its laws are carried out . . . is not subject to proscription under the [d]ue [p]rocess [c]lause unless it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."[12] (Internal quotation marks omitted.) Id., 201–202. Based on that analysis of the claimed historical basis of the defendant's asserted right, the court concluded that the state procedural rule did not offend a traditional, fundamental principle of justice. Id., 202–206.

---

[12] I note that the Supreme Court has not interpreted the concept of a fundamental principle of justice as synonymous with the concept of a fundamental right, a concept central to a substantive due process analysis. See, e.g., *Washington* v. *Glucksberg*, 521 U.S. 702, 719–21, 117 S. Ct. 2258, 138 L. Ed. 2d 772 (1997). Instead, the court has understood fundamental principles of justice to be confined to procedural rights. See *Montana* v. *Egelhoff*, 518 U.S. 37, 47, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (defendant bears burden in procedural due process challenge to show that "the *principle of procedure* violated by the rule . . . is so rooted in the traditions and conscience of our people as to be ranked as fundamental" [emphasis altered; internal quotation marks omitted]). Thus, although the allegations of the defendant in the present case that the protective order affects rights that have been deemed to be fundamental would be relevant to a substantive due process inquiry, and would also be relevant to the consideration of a civil procedural due process claim—because the fundamental nature of the individual right would be relevant to the balancing test—the fact that the defendant's access to his home and children is affected by the criminal protective order is not relevant to the procedural due process inquiry under *Medina* and *Patterson*. It is the nature of the asserted procedural right that is determinative.

Adopting the *Patterson* analytical framework in *Medina*, the court considered the defendant's claim that the allocation to him of the burden to prove his incompetence to stand trial, by a preponderance of the evidence, violated his right to due process. *Medina* v. *California*, supra, 505 U.S. 439. The court concluded, on the basis of its review of the "historical treatment of the burden of proof in competency proceedings," that the allocation of the burden to the defendant did not offend a fundamental principle of justice. Id., 446. In analyzing the historical basis of the claimed right, the court noted that there was, in fact, "no settled tradition on the proper allocation of the burden of proof in a proceeding to determine competence." Id.

The United States Supreme Court subsequently has reinforced its declaration in *Medina* that the applicable rule in the criminal context is not the *Mathews* balancing test, but rather the *Patterson* historical basis test. In *Montana* v. *Egelhoff*, 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality opinion), the United States Supreme Court considered the defendant's claim that his "right to have a jury consider evidence of his voluntary intoxication in determining whether he possesse[d] the requisite mental state is a fundamental principle of justice." (Internal quotation marks omitted.) The court explained that in applying the *Patterson* test: "Our primary guide in determining whether the principle in question is fundamental is, of course, historical practice." Id. The court then looked to the historical roots of the asserted right, citing as far back as English common law. Id., 44. In the course of its analysis, the court clarified that "[i]t is not the [s]tate which bears the burden of demonstrating that its rule is deeply rooted, but rather [the] respondent who must show that the principle of procedure *violated* by the rule (and allegedly required by due process) is so rooted in the traditions and conscience of our people as to be ranked

as fundamental." (Emphasis in original; internal quotation marks omitted.) Id., 47. The court considered the more modern permutation of the rule, which allows for an exception admitting evidence of intoxication with respect to an offense that requires a specific intent, but concluded, "[a]lthough the rule allowing a jury to consider evidence of a defendant's voluntary intoxication where relevant to mens rea has gained considerable acceptance, it is of too recent vintage, and has not received sufficiently uniform and permanent allegiance, to qualify as fundamental . . . ." Id., 51. Significantly, and consistent with *Medina* and *Patterson*, the court did not engage in *any* type of balancing inquiry in resolving the defendant's claim.

Federal courts consistently have applied the *Patterson* test to due process challenges of state rules of criminal procedure. See, e.g., *Bey* v. *Bagley*, 500 F.3d 514, 521–23 (6th Cir. 2007) (denying defendant's due process challenge to state's procedural rule allowing evidence of other crimes under identity exception; defendant failed to show that claimed violation fell under narrow category of procedural rules that offended deeply rooted principle of justice); *Lannert* v. *Jones*, 321 F.3d 747, 754 (8th Cir.) (concluding that asserted right to have battered spouse syndrome evidence considered by jury in connection with defense of self-defense was not " 'fundamental principle of justice' " and finding no violation of procedural due process), cert. denied, 540 U.S. 917, 124 S. Ct. 307, 157 L. Ed. 2d 212 (2003); *Hines* v. *Miller*, 318 F.3d 157, 161–62 (2d Cir.) (after noting that District Court improperly applied *Mathews* balancing test instead of *Patterson* test, finding no historical basis for claimed right to evidentiary hearing on motion to withdraw guilty plea, and, therefore, no constitutional right to evidentiary hearing), cert. denied, 538 U.S. 1040, 123 S. Ct. 2089, 155 L. Ed. 2d 1075 (2003). The more narrow recognition

of rights in the criminal context is due to the fact that "[t]he [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause invites undue interference with both considered legislative judgments and *the careful balance that the [c]onstitution strikes between liberty and order*." (Emphasis added.) *Medina* v. *California*, supra, 505 U.S. 443.

The present statutory scheme challenged by the defendant, which entitles a family violence defendant only to notice and a hearing at the time of arraignment, at which the defendant has the right to be heard, reflects the very type of careful balancing of society's interests—in this context, the interest in protecting victims of family violence from further intimidation and abuse—against the rights of the accused that *Patterson* deemed to be appropriately the province of state legislatures. *Patterson* v. *New York*, supra, 432 U.S. 210. Section 46b-38c was passed as part of Public Acts 1986, No. 86-337, entitled, "An Act Concerning Family Violence Prevention and Response" (act).[13] The legislative history of the act makes clear that its primary purpose

---

[13] The legislation was enacted following a successful civil rights action brought by Tracey Thurman and her son, Charles Thurman, Jr., against the defendants, the city of Torrington and police officers employed by the city. See *Thurman* v. *Torrington*, 595 F. Sup. 1521 (D. Conn. 1984). The District Court refused to dismiss Tracey Thurman's claim alleging that the defendants had violated her right to equal protection under the law by impermissibly providing police protection to "persons abused by someone with whom the victim has no domestic relationship," but affording lesser protection "when the victim is (1) a woman abused or assaulted by a spouse or boyfriend, or (2) a child abused by a father or stepfather." Id., 1527. A jury later awarded Tracey Thurman $2.3 million in compensatory damages. M. Hoctor, comment, "Domestic Violence as a Crime Against the State: The Need for Mandatory Arrest in California," 85 Cal. L. Rev. 643, 654 (1997). When the defendants challenged the award on appeal, Tracey Thurman settled out of court for $1.9 million in damages and her son was awarded an additional $300,000. Id., 654 n.83.

was to implement a comprehensive system that would most effectively intervene in instances of domestic violence to protect victims from further harm, but not at the expense of the rights of defendants. The act effected a significant change in the state's criminal law, creating many procedural safeguards and services, both for victims of family violence and offenders, that had not before been available in this state. Astrida Olds, the chair of the governor's task force on family violence, testified before the judiciary committee that the act was "intended to create an environment for effective intervention in cases that clearly have become official public matters." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 2, 1986 Sess., p. 509. The act mandated "uniform procedure[s] for every police department to govern their responses to family violence incidents," created family violence intervention units that "would immediately take on each case, assess it and provide recommendations to judges on prosecution and victim services," required that a defendant's court appearance take place at the next court date, and instituted, for the first time, "offender services in the form of a program of education for batterers." Id., p. 511, remarks of Astrida Olds. In his summary of the proposed legislation, Representative William L. Wollenberg stated succinctly that "it's an attempt to prevent family violence." 29 H.R. Proc., Pt. 14, 1986 Sess., p. 5254. Speaking in support of the bill, Representative Pauline R. Kezer stated that the law would make "a meaningful change in public policy that will reduce and prevent domestic violence. It has been shown that similar measures in other states that have been taken have indeed reduced the rate of return visits by policemen to the homes in terms of domestic violence." Id., p. 5259. Representative Patricia A. Dillon, also speaking in support of the bill, recognized that "[it is] a very, very delicate balance and I'm sure that we're doing this without

endangering the rights of the defendant . . . ." Id., p. 5269. The statutory scheme constructed by the legislature is an example of careful and subtle balancing in response to the peculiar difficulties presented to the state criminal justice system by victims and offenders who often live together, are married and intimately involved with each other. The solution crafted by the state legislature evidences precisely the state expertise that persuaded the United States Supreme Court, in *Patterson* and *Medina*, that matters of criminal procedure, in the absence of a showing that those procedural rules offend some deeply rooted principle of justice, are properly the task of the state legislature, not the courts.

The defendant specifically seeks a full evidentiary hearing to allow him to challenge the imposition of nonfinancial conditions of release. The majority concludes that, although the defendant does not have a procedural due process right to a full evidentiary hearing, he is entitled to the newly defined, expanded, second hearing. The challenged procedural rule is the failure to require more than a brief hearing at which the defendant is not permitted to present evidence; the affected principle of justice is the right to pretrial release absent the imposition of nonfinancial conditions. The historical basis inquiry properly should examine whether the principle of justice that the defendant claims is "offended" by the state's procedural rule is so deeply rooted in our traditions that it is deemed a fundamental principle of justice. Not only does the defendant fail to make *any* showing that the state procedural rules—which do not require the trial court to hold a full evidentiary hearing following the issuance of a protective order as a condition of his release—violate a fundamental principle of justice, the defendant does not even cite to *Medina* or *Patterson*. The defendant instead relies on the *Mathews* balancing test, a test that, as I already have noted, is not even applicable in this

context. The defendant, therefore, fails to meet his burden of establishing that the asserted principle of justice that is implicated by the state's criminal procedural rules, namely, the right to pretrial release without the imposition of any nonfinancial conditions, is so deeply rooted in our traditions that it is deemed to be fundamental. Moreover, the majority's analysis fares no better than the defendant's. In my view, by incorrectly characterizing its constitutional analysis as statutory construction, the majority completely forgoes the opportunity to engage in *any* constitutional analysis of the defendant's claim, and precludes itself from providing any reasoning to support its conclusion that due process requires the creation of this new right. As a result, there has been no showing whatsoever that procedural due process requires that the defendant be granted the right to the new, expanded hearing.

### III

Finally, I explain the various prudential and policy reasons that persuade me to conclude that the majority's decision is both imprudent and unnecessary. Specifically, the new rule announced by the majority today is: (1) unfair to defendants in other criminal cases, because it singles out family violence defendants for special treatment; (2) unwise, because it does not take into account the special vulnerability of victims of family violence and undermines the efforts that the legislature has made to protect these victims; (3) unworkable, because it burdens already busy trial courts and provides only conflicting and confusing guidance; and (4) unnecessary, because trial courts already have the discretion to order, on a case-by-case basis, what the majority now holds is the defendant's right upon request.

### A

The majority's decision is unfair to other criminal defendants because no such procedure is extended to

them in connection with bail, the denial of which is a more serious deprivation than that suffered by family violence defendants who are released subject to a protective order. Put another way, the effect of the majority's decision is to create a privileged status for family violence defendants, even though they may suffer deprivations far less severe than other criminal defendants. I cannot envision any reason why they should be given such privileged status. I see no reason, in fact, why all criminal defendants should not have the same right. Neither § 54-63c (b) nor § 46b-38c contains special language to indicate that family violence defendants should be accorded greater rights than those accorded to other criminal defendants with respect to conditions of bail or release. All defendants are at risk of being deprived of liberty or other rights pending trial. There is no reason why all defendants should not have an expanded second hearing to determine the propriety of continuing bail.

B

The decision is unwise policy because the victims in these cases, who are recognized by our legislature as suffering a unique kind of vulnerability and as needing special protection, are now exposed to the likelihood of examination and cross-examination during an early stage of the proceedings, the net effect of which will be likely to intimidate them and even discourage prosecution of family violence cases.[14] In light of the particu-

---

[14] Legislative recognition of that unique vulnerability is evidenced both in the express language of §§ 54-63c and 46b-38c, as well as in the text and legislative history of Public Acts 1986, No. 86-337, which is detailed in part II of this concurring and dissenting opinion.

The unique difficulties of protecting victims of family violence from their abusers recently has been the focus of a series in the Hartford Courant, entitled "Battered Lives." See http://www.courant.com/news/domestic-violence (last visited October 23, 2009). The series explores the severity of the problem of domestic violence in our society and examines the particular difficulties presented to law enforcement when victims and abusers are connected by complex familial ties. Id.

lar context—one in which abusers traditionally have intimidated their victims to prevent them from pursuing criminal complaints against the abusers—the legislature's decision not to subject victims to cross-examination at such an early stage in the criminal proceedings strikes the proper balance between protecting the constitutional rights of *both* defendants *and* victims, and at the same time gives due weight to the state's interest in enforcing its laws.

The threat that this careful balance may be undermined is not an insignificant one. If the state believes that the order protecting the victim is in jeopardy, and opts to put the victim on the stand, the compelling policy reason for protecting family violence victims will be severely compromised. Defendants may cross-examine the victims but are likely to choose not to testify. The procedure would then become simultaneously a means by which defendants could intimidate victims with the aim of preventing them from proceeding with the prosecution, a real risk in family violence cases, and a "discovery vehicle" for the benefit of defendants. Defendants could, in fact, proffer highly damaging challenges to victims' stories, thereby virtually compelling the state to call victims in order to prove the necessity of continuing the order. Ironically, no other crime victims are placed at such a risk that they may be compelled to take the witness stand and face cross-examination by the accused at such an early stage of a criminal case.

## C

The creation of the second, expanded hearing encumbers the criminal justice system by imposing burdensome and confusing duties on busy trial judges, yet provides only confusing guidance to assist the trial judges in complying with the new rule. Specifically, the framework created by the majority consists of a

combination of specific instructions and general, unspe-
cific requirements. For example, a specific fair prepon-
derance standard is prescribed, but it is to be applied
to a mix of proffers. Such proffers include "reliable
hearsay," an undefined term, other material that may
be beyond the rules of evidence, and, presumably, argu-
ment. In short, for every instruction given, new ques-
tions arise. In my view, little if anything is gained by
the process of attempting to give a few structural details
for governing a vague and unspecified discretionary
procedure.

I provide a few, brief examples of some of the difficul-
ties that may arise as a result of this new rule. At arraign-
ment, the court must comply with the initial hearing
requirement, but also must respond to a request by the
defendant for a second hearing by providing such a
hearing within a reasonable time. It is unclear whether
the court must inform the defendant, during the first
hearing, of his right to a second hearing. Also unclear
is what constitutes a reasonable time. Presumably, that
determination is left to the discretion of the trial court.
Suppose the state is ready to make "proffers" based on
its file at the time of arraignment—would the trial court
have discretion to hold the expanded hearing then and
there, or may the defendant demand time to prepare
for his "proffers?"

As for the applicable procedure during the second
hearing, it is unclear from the majority opinion whether
the "proffers" should be offers of proof, accompanied,
or not, by any reports, statements or other material.
"Reliable hearsay" also is unexplained and uncertain
as well as the meaning of the term "rigors of . . . evi-
dence." The court must make a finding as to whether
the state has met its burden of proof by a fair preponder-
ance of the evidence. How the trial court is to make a
finding by a fair preponderance of the evidence based
on nothing more than "proffers" of information of vary-

ing levels of reliability and value is not specified. Nor is it clear how this procedure, which may involve only "proffers," will create a record for purposes of appeal.

## D

The decision is unnecessary because trial courts already have similar discretion in deciding whether to issue such orders. Under the new procedure, the trial court has complete discretion over reasonable scheduling, the scope of the expanded hearing, the information that may be submitted and the appropriate relief. This differs in small measure, if at all, from present procedure, except as to outlining some of the structural steps and areas of discretion. If the trial courts choose to apply this procedure in most cases based on no more than offers of proof, defendants will gain little that is not available with the present discretionary procedure, other than having a second hearing at which they can make proffers as well. In short, trial courts already appear to have the discretion to do all that is provided by the new hearing procedure with no more uncertainty than presently exists.

In summary, the newly created procedure in my view accomplishes little, risks a great deal for victims, and may significantly burden already overcrowded dockets. It singles out a particular class of criminal defendants for a special procedure that establishes a right of uncertain dimension. My hope is that the trial courts will exercise their discretion cautiously and wisely in weighing the proffers of "evidence" and in protecting the victims in these cases in the course of determining whether an order should be issued. I believe that the United States Supreme Court wisely recognized in *Patterson* that, in the area of criminal law, the legislature is in the best position to engage in the "subtle balancing" of society's interests in safety against the rights of defendants. *Patterson* v. *New York*, supra, 432 U.S. 210. The

majority's decision today changes the balance that the legislature deemed to be the appropriate one, and it is the duty of the trial courts—and I do not deem this to be an insurmountable task, by any means—to ensure that the delicate balance that had been arrived at by the legislature is not thereby disturbed.

For the foregoing reasons, I respectfully dissent.

PALMER, J., dissenting in part. Under General Statutes § 54-63c (b),[1] a police officer who has arrested a person for a family violence crime[2] may release that person with financial conditions or nonfinancial conditions or both. With respect to nonfinancial conditions, the officer may require, inter alia, that the arrestee comply with specified restrictions on his travel, association or residence for the protection of the alleged victim. General Statutes § 54-63c (b). Section 54-63c (b) also provides that any such nonfinancial conditions of release imposed by the police shall remain in effect until the arrestee's presentment in court in accordance with General Statutes § 54-1g (a).[3] Finally, § 54-63c (b) provides that, at the time of the presentment, the arrestee is entitled to a "hearing" pursuant to General Statutes § 46b-38c (e)[4] with regard to any protective order that the court may issue as a condition of bail or

[1] See footnote 2 of the majority opinion for the text of § 54-63c (b).

[2] A "family violence crime" is defined as a misdemeanor or felony that "in addition to its other elements, contains as an element thereof an act of family violence to a family member . . . ." General Statutes § 46b-38a (3).

"Family violence" is defined as "an incident resulting in physical harm, bodily injury or assault, or an act of threatened violence that constitutes fear of imminent physical harm, bodily injury or assault between family or household members." General Statutes § 46b-38a (1).

[3] General Statutes § 54-1g (a) provides in relevant part: "Any arrested person . . . who is charged with a family violence crime . . . shall be promptly presented before the superior court sitting next regularly for the geographical area where the offense is alleged to have been committed. . . ."

[4] See footnote 4 of the majority opinion for the text of § 46b-38c (e).

release. As the majority acknowledges, the sole claim that the defendant, Fernando A., raised in the trial court, and the sole claim that he raises on appeal, is that the term "hearing," as used in § 54-63c (b) with reference to § 46b-38c (e), means a full evidentiary hearing, that is, an adversarial, trial-like proceeding. The defendant contends on appeal, as he did in the trial court, that he has a right to such a hearing under both the due process clause of the fourteenth amendment to the federal constitution and §§ 54-63c (b) and 46b-38c (e). Even though the majority agrees with the trial court that the defendant is not entitled to such a hearing, the majority nevertheless sees fit to reverse the trial court. The majority further concludes that the hearing to which the defendant is entitled under §§ 54-63c (b) and 46b-38c (e) is a bifurcated proceeding that affords him greater rights than those accorded at all other hearings concerning all other conditions of bail or release. Although I agree with the majority that the defendant had no right to a full evidentiary hearing, I believe that the majority's reversal of the trial court is unsupportable, and unfair to the trial court, because the majority is clearly *affirming* the trial court's denial of the defendant's request for a full evidentiary hearing. More importantly, I also disagree with the majority's construction of the term "hearing" for purposes of §§ 54-63c (b) and 46b-38c (e) because that construction is utterly devoid of support in the pertinent statutory language, legislative history or elsewhere. Contrary to the determination of the majority, the trial court correctly concluded that a family violence arrestee enjoys the same rights under §§ 54-63c (b) and 46b-38c (e) that he would be entitled to at any other hearing involving a condition of bail or release. I therefore dissent in part.[5]

---

[5] I agree with the majority only to the extent that it determines that the defendant is not entitled to a full evidentiary hearing and affirms the decision of the court, *Pavia, J.*

## I

Before addressing the merits of the defendant's claims, it is necessary to underscore certain aspects of the history and substance of the statutory scheme at issue in this case. In 1986, the legislature enacted Public Acts 1986, No. 86-337, entitled "An Act Concerning Family Violence Prevention and Response," § 3 of which is now codified as amended at § 46b-38c. As the majority has explained, § 46b-38c was enacted in response to the domestic abuse of Tracey Thurman and the inadequate police response to that abuse. See 29 H.R. Proc., Pt. 14, 1986 Sess., pp. 5258–59, remarks of Representative Pauline R. Kezer. Subsections (a) and (b) of § 46b-38c provide for the creation of local family violence response and intervention units within the state judicial system to respond to cases of family violence. Subsection (c) provides that each such local family violence intervention unit shall, inter alia, "(1) [a]ccept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date . . . [and] (3) provide or arrange for services to victims and offenders . . . ." General Statutes § 46b-38c (c). Subsection (d) of General Statutes § 46b-38c provides in relevant part: "In all cases of family violence, a written or oral report and recommendation of the local family violence intervention unit shall be available to a judge at the first court date . . . . A judge of the Superior court may consider and impose the following conditions to protect the parties, including, but not limited to: (1) Issuance of a protective order pursuant to subsection (e) of this section; (2) prohibition against subjecting the victim to further violence; (3) referral to a family violence education program for batterers; and (4) immediate referral for more extensive case assessment. . . ." Finally, General Statutes § 46b-38c (e) provides in relevant part that "[a] protective order issued under this section may

include provisions necessary to protect the victim from threats, harassment, injury or intimidation by the defendant, including, but not limited to, an order enjoining the defendant from (1) imposing any restraint upon the person or liberty of the victim, (2) threatening, harassing, assaulting, molesting or sexually assaulting the victim, or (3) entering the family dwelling or the dwelling of the victim. . . . Such order shall be made a condition of the bail or release of the defendant . . . ." Although subsection (e) of § 46b-38c also indicates that a defendant charged with a family violence crime shall be given notice and an opportunity to be heard prior to the issuance of an order under that statutory section, there is nothing in § 46b-38c or elsewhere in our statutes that describes the nature of the hearing to which the defendant is entitled. The pertinent legislative history also is silent with respect to the required hearing.

In 2007, the legislature passed Public Acts 2007, No. 07-123 (P.A. 07-123), entitled "An Act Concerning Domestic Violence," which amended, among other statutes, General Statutes (Rev. to 2007) § 54-63c. The primary purpose of the amendment to General Statutes (Rev. to 2007) § 54-63c was to protect the safety of victims of family violence by authorizing the police to order the release of a person charged with the commission of a family violence crime with nonfinancial conditions that "may require that the arrested person do one or more of the following: (1) Avoid all contact with the alleged victim of the crime, (2) comply with specified restrictions on the person's travel, association or place of abode that are directly related to the protection of the alleged victim of the crime, or (3) not use or possess a dangerous weapon, intoxicant or controlled substance." P.A. 07-123, § 1, codified at General Statutes § 54-63c (b). The legislature also added the following language to the statute: "Any nonfinancial conditions of release imposed pursuant to this subsection shall

remain in effect until the arrested person is presented before the Superior Court pursuant to subsection (a) of section 54-1g. On such date, the court shall conduct a hearing pursuant to section 46b-38c at which the defendant is entitled to be heard with respect to the issuance of a protective order." P.A. 07-123, § 1, codified at General Statutes § 54-63c (b). Neither § 54-63c (b) nor its legislative history contains any other reference to the hearing to be conducted by the court in connection with the issuance of a protective order.

## II

With this statutory background in mind, I now turn to the relevant undisputed facts and procedural history, some of which are set forth in the majority opinion. On August 8, 2007, the victim, who is the defendant's wife, filed an action seeking to dissolve her marriage to the defendant. At that time, the couple lived together with their two children, ages four and two. On August 27, the victim, in accordance with General Statutes § 46b-15,[6] sought and received an ex parte temporary protective order barring the defendant from, inter alia, entering the family dwelling. At two September, 2007 hearings conducted by the trial court, *Shay, J.*, in compliance with the requirements of § 46b-15, the victim testified that the defendant had threatened her and her parents, and that he had pushed her. She further testified that she was afraid of the defendant. With respect to the pushing incident, however, the victim acknowledged that she had not suffered any cuts or bruises as a result of the incident and that she had not sought medical attention.

At the conclusion of the hearings, the trial court declined to extend the protective order, concluding that the victim's allegations did not meet the stringent requirements of § 46b-15. The trial court did not dis-

---

[6] See footnote 9 of the majority opinion for the relevant text of § 46b-15.

count or discredit the victim's testimony but found that the incidents about which the victim had testified were primarily verbal in nature and did not rise to the level of "a continuous threat of present physical pain or physical injury" within the meaning of General Statutes § 46b-15 (a).

Several weeks later, on October 14, 2007, the police were called to the home shared by the victim and the defendant. According to the victim, who exhibited "a large golf ball sized bump" on her forehead, she and the defendant had had an argument during which the defendant pushed her down a flight of stairs and kicked her in the head. The couple's two children witnessed the victim's fall. After the incident, the defendant left the residence in his vehicle. The police called an ambulance to take the victim to the hospital, where she was treated for contusions on her head and knee. After taking a sworn statement from the victim and interviewing the victim's treating physician, the police arrested the defendant and charged him with assault in the third degree, two counts of risk of injury to a child, reckless endangerment and disorderly conduct. In accordance with § 54-63c (b), the police released the defendant on the conditions that he not enter the family home and that he avoid all contact with the victim.

The defendant was arraigned the next day, October 15, 2007. At that time, he requested a full evidentiary hearing prior to the issuance of any protective order, claiming that such a hearing was mandated both by §§ 54-63c (b) and 46b-38c (e), and by the due process clause of the fourteenth amendment to the United States constitution. The defendant also maintained that he was entitled to that hearing at that time, on the day of his presentment, a claim predicated on the express language of § 54-63c (b). The state objected to the defendant's request and sought a protective order prohibiting the defendant from contacting the victim or the couple's

children, a request with which the victim's advocate and the family services counselor concurred. The trial court, *Pavia, J.*, denied the defendant's request for a full evidentiary hearing but continued the case to October 18, 2007, at which time the defendant could renew his request for such a hearing. In the meantime, however, Judge Pavia issued a protective order barring the defendant from entering the family home and from having any contact with the victim. Because the local family violence intervention unit had informed the court that it was "concerned about the children in terms of their involvement and proximity to" their parents' situation, Judge Pavia also indicated that the protective order "extend[ed] to the [victim's] minor children, with the caveat that the defendant [could] have third-party visitation . . . ."[7]

At the hearing on October 18, 2007, before the court, *Bingham, J.*, the defendant again claimed that he was entitled to a full evidentiary hearing—or what defense counsel referred to as a "trial-like" proceeding—for the purpose of challenging the issuance of the protective order. Judge Bingham denied the defendant's request for such a hearing, explaining that the defendant was "not entitled to a full hearing, with the right to subpoena witnesses and the right to call the [victim]. This puts an undue burden on the [victim] because she . . . evidently . . . is afraid of the [defendant] . . . . And you're not entitled to a full trial here in this court." Thereafter, Judge Bingham explained that the hearing contemplated under §§ 54-63c (b) and 46b-38c (e) "is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing." The court then stated: "So, your request, as stated by you, is denied." At no time did the defendant make any proffer or otherwise present any facts suggesting that the evidence or informa-

---

[7] On November 8, 2007, the court, *Bingham, J.*, modified the protective order by facilitating the defendant's visitation with his children.

tion on which the court had relied in issuing the family violence protective order was inaccurate or incorrect. The sole claim that the defendant raised, rather, was that he had a statutory and due process right to a full evidentiary hearing, at which (1) the state was required to establish the need for a protective order through the use of evidence that satisfied our evidentiary rules, and (2) the defendant had the right to cross-examine and call witnesses.

In these consolidated appeals from the decisions of the trial court, *Pavia, J.*, and *Bingham, J.*, the defendant claims that the court violated his right to due process and his rights under §§ 54-63c and 46b-38c by rejecting his request for a full evidentiary hearing. Thus, on appeal, the defendant raises the same claim of entitlement to a full evidentiary hearing that he raised in the trial court. According to the defendant, the term "hearing" in § 46b-38c (e) "plainly requires that the defendant be allowed to present evidence and test the state's evidence through cross-examination." In addition, the defendant claims that the state cannot rely on hearsay to establish the desirability of a family violence protective order. The defendant contends, rather, that §§ 54-63c (b) and 46b-38c (e) contemplate the same full-blown adversarial hearing that is provided in the context of a civil action brought under § 46b-15, including the right to subpoena the alleged victim and other witnesses to testify at the hearing.

The majority rejects the defendant's claim that he is entitled to a full evidentiary hearing. Specifically, the majority concludes that "§ 54-63c (b), and the cross-referenced . . . § 46b-38c, permit the trial court to issue a criminal protective order at the defendant's arraignment after consideration of oral argument and the family violence intervention unit's report . . . . [Nevertheless] the trial court is required to hold, at the defendant's request made at the initial hearing, a

subsequent hearing within a reasonable period of time at which the state will be required to prove the continued necessity of that order by a fair preponderance of the evidence, which may include reliable hearsay." The majority also concludes, as a matter of statutory construction, that the defendant does not have the right at that hearing either to require the state to proceed by way of admissible evidence or to subpoena the victim or other witnesses; according to the majority, however, he does have a qualified right to testify himself and to adduce other testimony. Finally, the majority reverses the decision of the trial court "[b]ecause the defendant did not receive this subsequent hearing as requested . . . ."

For the reasons that follow, I agree with the majority that the defendant is not constitutionally entitled to a full evidentiary hearing. Because there is nothing in the relevant statutes or legislative history to suggest that the defendant has a statutory right to a full evidentiary hearing, I also agree that the defendant has no such entitlement. I disagree, however, with the majority's conclusion that the hearing to which the defendant is entitled under our statutory scheme is different from a bail hearing.[8] Furthermore, because the majority agrees with the trial court's decision to reject the only claim

---

[8] The majority does not articulate how the rights to which it asserts a defendant is entitled at a hearing under § 46b-38c (e) differ from the rights to which a defendant is entitled at any other bail hearing. One difference, of course, is that, in the case of bail hearings generally, the court must exercise its sound discretion in setting bail and imposing conditions of release; under the majority's interpretation of §§ 54-63c (b) and 46b-38c (e), however, the state must prove the need for a protective order by a preponderance of the evidence. Otherwise, however, it is not clear exactly how the hearing envisioned by the majority is different from a bail hearing. In view of the fact that the majority deems it appropriate to reverse the decision of the trial court, *Bingham, J.*, that the defendant was entitled to a hearing akin to a bail hearing, it must be presumed that, in the majority's view, the hearing rights afforded under §§ 54-63c (b) and 46b-38c (e) are greater than those ordinarily afforded at bail hearings.

that the defendant raised, namely, that he has a statutory and constitutional right to a full evidentiary hearing, the majority's reversal of the decision of the trial court, *Bingham, J.*, is improper even under its own flawed conclusion regarding the nature of the hearing to which the defendant is entitled.

### III

As I have indicated, the defendant claims on appeal, as he claimed in the trial court, that whatever hearing rights he may be afforded under §§ 54-63c and 46b-38c, he has a due process right to a full evidentiary hearing before a court may issue a protective order under those provisions. Even though the defendant devotes the bulk of his brief to this contention, the majority disposes of the claim in a footnote. See footnote 21 of the majority opinion. Although I agree with the majority that the defendant cannot prevail on his constitutional claim, I do not believe that the majority's analysis of the claim is satisfactory. Therefore, before addressing the hearing rights to which the defendant is statutorily entitled, I turn to his claim of a constitutional violation.

Both the state and the defendant utilize the balancing test set forth by the United States Supreme Court in *Mathews* v. *Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976), for determining whether a governmental practice or procedure satisfies the requirements of due process. Neither the state nor the defendant, however, mentions the more recent, and more narrow, test adopted by the court in *Medina* v. *California*, 505 U.S. 437, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992), for evaluating whether such practices or procedures satisfy due process standards in the criminal context. For the reasons that follow, I am inclined to agree with the parties that the *Mathews* test is the appropriate test for purposes of the present case. Nevertheless, as I also explain

more fully hereinafter, the defendant cannot prevail under either of the two tests.[9]

In *Mathews*, the court explained that "[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances. . . . [D]ue process is flexible and calls for such procedural protections as the particular situation demands. . . . Accordingly, resolution of the issue whether the administrative procedures provided . . . are constitutionally sufficient requires analysis of the governmental and private interests that are affected. . . . More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the [g]overnment's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." (Citations omitted; internal quotation marks omitted.) *Mathews* v. *Eldridge*, supra, 424 U.S. 334–35. Although *Mathews* arose out of a dispute concerning the adequacy of the administrative procedures afforded a recipient of social security disability benefit payments prior to the termination of those benefits; see id., 323–26, 332–33; both this court and the Appellate Court have applied that test in criminal cases. See, e.g., *State* v. *Patterson*, 236 Conn. 561, 569–76, 674 A.2d 416 (1996) (applying *Mathews* test and concluding that criminal

---

[9] Ordinarily, it might be appropriate simply to adopt the analytical approach advanced by the parties. Because, however, this is an appeal under General Statutes § 52-265a that implicates the public interest, and because the case involves a challenge to the constitutionality of one or more state statutes, it would not be proper to do so here.

defendant's federal constitutional right to procedural due process at sentencing does not include right to presentence investigation report); *State* v. *Lopez*, 235 Conn. 487, 492–93, 496–97, 668 A.2d 360 (1995) (applying *Mathews* test and concluding that trial court's order rectifying transcript without evidentiary hearing did not violate criminal defendant's federal constitutional right to procedural due process); *State* v. *Washburn*, 34 Conn. App. 557, 564–66, 642 A.2d 70 (applying *Mathews* test and concluding that requirements of federal due process are not violated by imposition of mandatory minimum thirty day jail sentence against criminal defendant who drove vehicle during summary twenty-four hour suspension period applicable to persons arrested for operating under influence of alcohol), cert. denied, 230 Conn. 912, 645 A.2d 1017 (1994); cf. *State* v. *Joyner*, 225 Conn. 450, 471, 625 A.2d 791 (1993) ("[b]orrowing the methodology of *Mathews*" in concluding that requiring criminal defendant to prove his insanity defense by preponderance of evidence does not violate state constitutional right to due process).

Following its decision in *Mathews*, however, the United States Supreme Court, in *Medina*, addressed a claim that principles of procedural due process bar a state from imposing on a criminal defendant the burden of establishing his incompetence to stand trial. See *Medina* v. *California*, supra, 505 U.S. 439. In resolving the claim, the court held that the *Mathews* balancing test did not apply; id., 443; concluding, instead, that the standard first identified in *Patterson* v. *New York*, 432 U.S. 197, 201–202, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), was applicable. *Medina* v. *California*, supra, 445. The court explained: "[T]he *Mathews* balancing test does not provide the appropriate framework for assessing the validity of state procedural rules which . . . are part of the criminal process. E.g., *People* v. *Fields*, 62 Cal. 2d 538, 542, 399 P.2d 369 [42 Cal. Rptr. 833] (compe-

tency hearing 'must be regarded as part of the proceedings in the criminal case') . . . cert. denied, 382 U.S. 858 [86 S. Ct. 113, 15 L. Ed. 2d 95] (1965).

"In the field of criminal law, we 'have defined the category of infractions that violate "fundamental fairness" very narrowly' based on the recognition that, '[b]eyond the specific guarantees enumerated in the [b]ill of [r]ights, the [d]ue [p]rocess [c]lause has limited operation.' . . . The [b]ill of [r]ights speaks in explicit terms to many aspects of criminal procedure, and the expansion of those constitutional guarantees under the open-ended rubric of the [d]ue [p]rocess [c]lause invites undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." (Citations omitted.) *Medina* v. *California*, supra, 505 U.S. 443.

The court further explained that "[t]he proper analytical approach . . . is that set forth in *Patterson* v. *New York*, [supra, 432 U.S. 201–202], which was decided one year after *Mathews*. In *Patterson*, [the court] rejected a due process challenge to a New York law [that] placed on a criminal defendant the burden of proving the affirmative defense of extreme emotional disturbance. Rather than relying [on] the *Mathews* balancing test, however, [the court] reasoned that a narrower inquiry was more appropriate: 'It goes without saying that preventing and dealing with crime is much more the business of the [s]tates than it is of the [f]ederal [g]overnment . . . and that we should not lightly construe the [c]onstitution so as to intrude [on] the administration of justice by the individual [s]tates. Among other things, it is normally "within the power of the [s]tate to regulate procedures under which its laws are carried out, including the burden of producing evidence and the burden of persuasion," and its decision in this regard is not subject to proscription under the [d]ue [p]rocess [c]lause unless "it offends some principle of justice so

rooted in the traditions and conscience of our people as to be ranked as fundamental." ' . . . As *Patterson* suggests, because the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition, it is appropriate to exercise substantial deference to legislative judgments in this area. The analytical approach endorsed in *Patterson* is thus far less intrusive than that approved in *Mathews*." (Citations omitted.) *Medina* v. *California*, supra, 505 U.S. 445–46.

A threshold issue, therefore, is whether the *Mathews* test or the *Medina* test applies to the determination of whether the trial court properly concluded that the defendant was not entitled to a full evidentiary hearing for the purpose of challenging the issuance of the protective order barring him from the family home during the pendency of his criminal case. The answer to this question hinges on whether the procedures pursuant to which protective orders are issued in criminal cases involving family violence "are part of the criminal process"; id., 443; or, put differently, "part of the proceedings in the criminal case . . . ." (Internal quotation marks omitted.) Id.

Although it is true, of course, that §§ 54-63c (b) and 46b-38c (e), the provisions at issue, implicate the procedures to be used in determining the conditions of release in certain criminal cases, I do not read *Medina* as necessarily requiring the application of the narrow test set forth therein to any criminal statute that may be characterized as procedural in nature. In fact, on the basis of the analysis employed by the United States Court of Appeals for the Second Circuit in a recent line of cases, a persuasive argument can be made that the *Mathews* balancing test, and not the *Medina* historical test, applies in the present case.

In the first of these cases, *Hines* v. *Miller*, 318 F.3d 157 (2d Cir.), cert. denied, 538 U.S. 1040, 123 S. Ct.

2089, 155 L. Ed. 2d 1075 (2003), the court affirmed the judgment of the District Court, which denied the petition for a writ of habeas corpus of Jesse Hines, who had alleged, inter alia, that he was denied due process when the New York state trial court declined to order an evidentiary hearing on his motion to withdraw his guilty plea to second degree murder. Id., 158–59, 164. The Court of Appeals concluded that, although the District Court properly had denied Hines' habeas petition, the District Court improperly had used the *Mathews* balancing test in doing so. Id., 161. The Court of Appeals reached this conclusion with little analysis, however, stating only that "[t]he [United States] Supreme Court has stated that it is inappropriate to employ the *Mathews* balancing test in criminal cases"; id.; and that "[t]he proper analytical approach" to deciding the issue was the approach set forth in *Medina*. (Internal quotation marks omitted.) Id., 161–62.

Soon after *Hines*, in *United States* v. *Abuhamra*, 389 F.3d 309 (2d Cir. 2004), the court addressed a claim by the defendant, Mohammed Abuhamra, following his conviction on federal charges, that the District Court had violated his due process rights by considering certain ex parte, in camera submissions when it denied him bail pending a resolution of his appeal. See id., 314. Applying the *Mathews* balancing test; id., 318; the Court of Appeals concluded that, as a general matter, principles of due process prohibit a District Court from using materials submitted ex parte and in camera for the purpose of determining whether to grant postconviction bail but that an exception to the prohibition against the use of such materials exists in certain narrowly specified circumstances.[10] Id., 328–29, 332. The court remanded the case to the District Court for reconsidera-

---

[10] Although the court in *Abuhamra* applied the *Mathews* test, it did not discuss the *Medina* standard or explain why the *Mathews* test was applicable.

tion of Abuhamra's application for bail in light of the exception to the general rule of exclusion that the court had carved out. See id., 332.

In *Krimstock* v. *Kelly*, 464 F.3d 246 (2d Cir. 2006), the court was required to decide whether the due process clause of the fourteenth amendment barred state prosecutors from unilaterally deciding to retain, as evidence in a criminal prosecution, motor vehicles that had been seized as instrumentalities of the crime of operating a vehicle under the influence of alcohol or drugs. Id., 248. In determining what process was due the owner of such a vehicle before it could be impounded by the state as evidence in a pending case, the court carefully considered whether to apply the *Mathews* balancing test or the historical approach approved by *Medina* and applied by the court in *Hines*. See id., 253–54. The court distinguished both *Hines* and *Medina*, stating that those cases "considered challenges to the process afforded during criminal proceedings themselves." Id., 254. The court further observed that *Krimstock* "involve[d] no challenge to an underlying criminal proceeding or the procedural rights due the criminal defendant. Rather, it involve[d] the deprivation of property pending a criminal proceeding . . . ." Id. The court then proceeded to apply the *Mathews* test, concluding that it "weigh[ed] in favor of having review by a neutral fact-finder of a prosecutor's decision to retain a vehicle as potential evidence . . . although no adversarial hearing [was] required."[11] Id., 255.

The final case is *McKithen* v. *Brown*, 481 F.3d 89 (2d Cir. 2007), cert. denied, 552 U.S. 1179, 128 S. Ct. 1218, 170 L. Ed. 2d 59 (2008), in which the court considered whether the plaintiff, Frank McKithen, had a due process right to postconviction DNA testing of certain evi-

---

[11] The court in *Krimstock* also made it clear that prosecutors could seek a retention order ex parte. *Krimstock* v. *Kelly*, supra, 464 F.3d 255.

dence in the possession of the government. Id., 92. The court ultimately remanded the case to the District Court; id., 108; which had dismissed McKithen's claim for lack of subject matter jurisdiction. Id., 95. On remand, the District Court was required to decide whether McKithen's "post-conviction liberty interest encompasse[d] an interest in accessing or possessing potentially exonerative biological evidence"; id., 106–107; and, if so, the "contours of that right . . . ." Id., 93. The Court of Appeals made it clear that, if the District Court decided the first issue in McKithen's favor, then the District Court was required to apply the *Mathews* test, rather than the *Medina* test, to determine whether McKithen was entitled to such testing in the particular circumstances presented. Id., 107. In reaching its conclusion, the court expressly relied on the rationale of *Krimstock* with respect to the *Mathews/Medina* distinction, explaining that *Mathews* is applicable "because McKithen [was] not bringing a challenge to his underlying conviction or to 'the process afforded during criminal proceedings themselves' . . . but instead [was] seeking *post*-conviction access to evidence."[12] (Citation omitted; emphasis in original.) Id., quoting *Krimstock* v. *Kelly*, supra, 464 F.3d 254.

These cases, taken together, suggest that *Mathews*, and not *Medina*, represents the applicable due process test when, as in the present case, the challenged proce-

---

[12] In support of its determination that, on remand, the *Mathews* balancing test is applicable, the court also cited approvingly from the following analysis of Judge J. Michael Luttig, formerly of the Fourth Circuit Court of Appeals: "I believe that [*Mathews*], rather than [*Medina*], provides the proper analytical framework for determining whether there exists a procedural due process right to [postconviction] access [to evidence]. The asserted right of access does not entail a challenge to the underlying conviction, and neither (at least comfortably) is the state's denial of access equivalent to a state rule of criminal procedure governing the process by which one is tried and found guilty or innocent of criminal offense." *Harvey* v. *Horan*, 285 F.3d 298, 315 n.6 (4th Cir. 2002).

dure is not directly related either to the process by which the defendant's guilt or innocence is adjudicated or to the accuracy of that adjudication. Because the essential protections of the bill of rights relate primarily to rights associated with the adjudicative process itself, and because the rationale of *Medina* is predicated on the fact that the specific guarantees of the bill of rights, in contrast to the "open-ended rubric" of the due process cause; *Medina* v. *California,* supra, 505 U.S. 443; "[speak] in explicit terms to many aspects of criminal procedure"; id.; a strong argument can be made that applying *Medina* to the present circumstances would be to read that case more expansively than its reasoning warrants. Indeed, as I previously noted, this court consistently has applied the *Mathews* balancing test in criminal cases, including cases decided after *Medina.* E.g., *State* v. *Patterson,* supra, 236 Conn. 569; *State* v. *Lopez,* supra, 235 Conn. 493. It is apparent, therefore, that this court does not view *Medina* as occupying the field with respect to due process challenges in the criminal arena.[13] Thus, although it would appear that the *Mathews* balancing test is the applicable test,[14] it need

---

[13] It is noteworthy that, in adopting a test for criminal cases that is "far less intrusive" than the *Mathews* balancing test; *Medina* v. *California,* supra, 505 U.S. 446; the court in *Medina* explained that "substantial deference to legislative judgments in this area"; id.; is appropriate because "the [s]tates have considerable expertise in matters of criminal procedure and the criminal process is grounded in centuries of common-law tradition . . . ." Id., 445–46. To some degree, therefore, the court in *Medina* was persuaded to adopt a far more narrow test for criminal cases on the basis of principles of federalism. To the extent that the *Medina* standard is predicated on such principles, that fact militates in favor of the application of the *Mathews* test when, as in the present case, a state procedural rule is subject to a due process challenge in state court. See *State* v. *Gonzales,* 130 N.M. 341, 356 n.1, 24 P.3d 776 (2001) (Bustamante, J., concurring) ("[t]he . . . [federalism] concerns [of the court in *Medina*] do not cast doubt on a state court's adaptation and use of the *Mathews* factors to determine what procedures are due in its own courts" [internal quotation marks omitted]).

[14] As I previously noted, in adopting a narrow test for due process challenges involving the criminal process, the court in *Medina* relied heavily on the fact that, because procedure in criminal cases is governed expressly by the bill of rights, the use of the broad language of the due process

not be decided definitively whether *Mathews* or *Medina* applies because, for the reasons set forth hereinafter, the defendant cannot prevail under either test.

## A

I first consider the applicable standard under *Medina*, pursuant to which a defendant claiming a due process violation "must sustain the usual heavy burden that a due process challenge entails"; *Montana* v. *Egelhoff*, 518 U.S. 37, 43, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality opinion); by establishing that the challenged procedural rule "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." (Internal quotation marks omitted.) *Medina* v. *California*, supra, 505 U.S. 445. In other words, the defendant "must show that the principle of procedure *violated* by the rule (and allegedly required by due process) . . . was so deeply rooted at the time of the [f]ourteenth [a]mendment (or perhaps has become so deeply rooted since) as to be a fundamental principle which that [a]mendment enshrined." (Citation omitted; emphasis in original.) *Montana* v. *Egelhoff*, supra, 47–48 (plurality opinion). "Our primary guide in determining whether the princi-

clause in such cases would invite "undue interference with both considered legislative judgments and the careful balance that the [c]onstitution strikes between liberty and order." *Medina* v. *California*, supra, 505 U.S. 443. Because the eighth amendment to the United States constitution, which itself is a provision of the bill of rights, expressly bars "[e]xcessive bail," and because a protective order issued under § 46b-38c "shall be made a condition of the bail or release of the defendant"; General Statutes § 46b-38c (e); it may be argued that the rationale underlying *Medina* is, indeed, applicable to the issue presented by this case. See *United States* v. *Abuhamra*, supra, 389 F.3d 323 ("[b]ail hearings fit comfortably within the sphere of adversarial proceedings closely related to trial"); cf. *Higazy* v. *Templeton*, 505 F.3d 161, 173 (2d Cir. 2007) (bail hearing was "part of the criminal case against [the plaintiff]" for purpose of determining whether coerced statement that had been taken from plaintiff by federal agent and used against him in bail hearing gave rise to cognizable civil claim against that agent for violation of plaintiff's rights under fifth amendment).

ple in question is fundamental is, of course, historical practice." Id., 43. In the present case, the procedural provision at issue, General Statutes § 54-63c (b), provides in relevant part that "the court shall conduct a hearing . . . at which the defendant is entitled to be heard with respect to the issuance of a protective order." As the majority and I agree, however, the defendant's right to be heard under § 54-63c (b) does not include the right to call the alleged victim as a witness at the hearing on the protective order. Thus, for purposes of the defendant's due process claim, the issue that we must decide is whether the right to call the alleged victim as a witness at the hearing is so deeply rooted in our history as to be considered fundamental. The answer to that question is plainly no.

That answer is dictated by a review of the case law governing the procedural due process rights of defendants at pretrial proceedings and, in particular, at post-arrest bail and release hearings. In *Gerstein* v. *Pugh*, 420 U.S. 103, 95 S. Ct. 854, 43 L. Ed. 2d 54 (1975), the United States Supreme Court concluded that the state "must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." Id., 125. Most importantly for our purposes, however, the court also concluded that "the [c]onstitution does not require an adversary determination of probable cause." Id., 123; see also id., 120. The state is therefore free to establish a procedure for the determination of probable cause that is not accompanied by the "adversary safeguards . . . [consisting of] counsel, confrontation, cross-examination, and compulsory process for witnesses." Id., 119. Because these protections are not required, the probable cause determination may be made informally, without an adversarial hearing, on the basis of hearsay evidence and written testimony.

Id., 120. Thus, although an arrestee cannot be held pending trial without a judicial determination of probable cause, the constitution does not require that the arrestee be afforded the right to challenge that determination in an adversarial setting. Because *Gerstein* permits the state to obtain an ex parte finding of probable cause by the court, it undermines the defendant's claim in the present case.

Furthermore, a protective order issued in a family violence case as a condition of bail or release in accordance with §§ 54-63c and 46b-38c is akin to other conditions of bail or release that may be set by the court in any other criminal case. See General Statutes § 54-64a (providing guidelines for release of defendants by judicial authority); Practice Book § 38-4 (same). In fact, a court may impose the very same condition of release that was imposed in the present case, namely, a bar against returning home, in virtually any other felony case. See General Statutes § 54-64a (c) (2) and (6) (upon determination that nonfinancial condition of release is appropriate, court may order, inter alia, that defendant "comply with specified restrictions on [his or her] travel, association or place of abode" and "avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense"); Practice Book § 38-4 (d) (2) and (6) (same). Moreover, "[a]s in the case of other pretrial proceedings such as arraignments and 'probable cause' determinations for warrants, bail hearings are 'typically informal affairs, not substitutes for trial or even for discovery. Often the opposing parties simply describe to the judicial officer the nature of their evidence; they do not actually produce it.' *United States* v. *Acevedo-Ramos*, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.); see also *United States* v. *Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986) (bail hearing cannot become a 'mini-trial' or 'a discovery tool for the defendant')." *United States* v.

*LaFontaine*, 210 F.3d 125, 131 (2d Cir. 2000). Thus, it is well established that an arrestee has no constitutional right to compulsory process in a bail hearing. See, e.g., *United States* v. *Edwards*, 430 A.2d 1321, 1336 (D.C. 1981), cert. denied, 455 U.S. 1022, 102 S. Ct. 1721, 72 L. Ed. 2d 141 (1982); see also *Querubin* v. *Commonwealth*, 440 Mass. 108, 118, 795 N.E.2d 534 (2003) ("[a] full-blown evidentiary hearing that includes the right to present and cross-examine witnesses is not needed or required [at a bail proceeding]"); cf. *Mendez* v. *Robertson*, 202 Ariz. 128, 130, 42 P.3d 14 (App. 2002) (no right to evidentiary hearing on defendant's request to modify conditions of release). Thus, the right of a defendant to call an adverse witness at a bail hearing is subject to approval by the court in the exercise of its sound discretion. In fact, I am aware of no case in which a court has concluded that a defendant has an unconditional right to present evidence for the purpose of challenging a condition of bail, and there is no reason why a family violence protective order that is imposed as a condition of release should be subject to any different procedural requirements.[15]

---

[15] Thus, in the present case, the trial court could have permitted the defendant to call the victim as a witness if the court reasonably believed that unusual circumstances had warranted it. Before compelling the presence of an adverse witness such as the victim, however, the court should require a proffer from the defendant detailing why such testimony is truly necessary. As the court in *United States* v. *Edwards*, supra, 430 A.2d 1321, explained, "with regard to [the defendant calling] the government's witnesses, and particularly the complaining witness, the government does have an interest in preventing premature discovery. It also has an interest in protecting the emotional and physical well-being of its witnesses. . . . [Thus] cross-examination for the limited purpose of impeaching the witness' credibility is an insufficient reason to compel a witness' presence. The requirement of a preliminary proffer [by the defendant], regarding the manner in which a witness' testimony will tend to [demonstrate the impropriety of the challenged financial or nonfinancial condition], is a reasonable limitation on the accused's right to call witnesses in his favor." (Citation omitted.) Id., 1338; see also id., 1334 ("If the court is dissatisfied with the nature of the proffer, it can always, within its discretion, insist on direct testimony. But the discretion should be left to the court without imposing on it the burden of limiting admissibility to [what] it would permit a jury to hear." [Internal quotation

Finally, in *United States* v. *Salerno*, 481 U.S. 739, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), the United States Supreme Court upheld the constitutionality of certain provisions of the federal Bail Reform Act of 1984 (act), Pub. L. No. 98-473, § 203 (a), 98 Stat. 1976, codified as amended at 18 U.S.C. § 3141 et seq., authorizing the preventive detention of a person charged with a federal offense on the ground that he poses a danger to any other person or the community. *Salerno* and its progeny also defeat the defendant's contention that he is entitled to a full evidentiary hearing for the purpose of challenging the issuance of a family violence protective order as a condition of release.

A brief explanation of the act is necessary to an understanding of the court's holding in *Salerno*. "The [a]ct represent[ed] the [n]ational [l]egislature's considered response to numerous perceived deficiencies in the federal bail process. By providing for sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted, Congress hoped to 'give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released.' . . .

marks omitted.]). Although it will be the rare case in which the court permits a defendant to subpoena the victim of a family violence crime to testify at the defendant's bail hearing, I believe that principles of due process militate strongly in favor of according the court that discretion. Thus, although bail hearings generally are relatively informal and brief, I agree with the statement of the Second Circuit Court of Appeals that, "while the informality of bail hearings serves the demands of speed, the [judicial officer] must also ensure the reliability of the evidence, 'by selectively insisting [on] the production of the underlying evidence or evidentiary sources [when] their accuracy is in question.'" *United States* v. *LaFontaine*, supra, 210 F.3d 131. In the present case, however, the defendant failed to provide the court with any facts or information to suggest that the victim's testimony was necessary; instead, he relied solely on his claimed unconditional right to call the victim as a witness.

"To this end, [18 U.S.C. § 3141 (a)] requires a judicial officer to determine whether an arrestee shall be detained. Section 3142 (e) [of title 18 of the United States Code] provides that '[i]f, after a hearing pursuant to the provisions of subsection (f), the judicial officer finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, he shall order the detention of the person prior to trial.' Section 3142 (f) [of title 18 of the United States Code] provides the arrestee with a number of procedural safeguards. He may request the presence of counsel at the detention hearing, he may testify *and present witnesses in his behalf, as well as proffer evidence,* and he may cross-examine other witnesses appearing at the hearing. If the judicial officer finds that no conditions of pretrial release can reasonably assure the safety of other persons and the community, he must state his findings of fact in writing, [18 U.S.C.] § 3142 (i), and support his conclusion with 'clear and convincing evidence,' [18 U.S.C.] § 3142 (f).

"The judicial officer is not given unbridled discretion in making the detention determination. Congress has specified the considerations relevant to that decision. These factors include the nature and seriousness of the charges, the substantiality of the [g]overnment's evidence against the arrestee, the arrestee's background and characteristics, and the nature and seriousness of the danger posed by the suspect's release. [18 U.S.C.] § 3142 (g). Should a judicial officer order detention, the detainee is entitled to expedited appellate review of the detention order. [18 U.S.C. § 3145 (b) and (c)]." (Citation omitted; emphasis added.) *United States* v. *Salerno,* supra, 481 U.S. 742–43.

The court in *Salerno* concluded that the act did not violate either substantive or procedural due process. Id., 746, 751–52. With respect to the latter, the court

rested its determination primarily on the fact that "the procedures by which a judicial officer evaluates the likelihood of future dangerousness are specifically designed to further the accuracy of that determination." Id., 751. As the court explained, among the procedural safeguards contained in the act is the right of the defendant to "present information by proffer or otherwise . . . ." Id.

Although the act contains certain procedural protections, including the right of the defendant to present evidence at a detention hearing; see 18 U.S.C. § 3142 (f) (2006); courts uniformly have concluded that the right to call witnesses under the act is conditional and not absolute. In other words, whether a defendant will be permitted to call an adverse witness to testify at a detention hearing conducted under the act is a matter within the sound discretion of the trial court, with due consideration of the particular facts and circumstances of the case. See, e.g., *United States* v. *LaFontaine*, supra, 210 F.3d 131 (District Court did not abuse its discretion in declining to permit defendant to call witness to testify at detention hearing); *United States* v. *Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (defendant has no right to confront nontestifying, adverse witnesses at detention hearings); *United States* v. *Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) (defendant has only conditional right to call adverse witnesses in detention hearing); *United States* v. *Winsor*, 785 F.2d 755, 756 (9th Cir. 1986) (defendant "has no right to cross-examine adverse witnesses who have not been called to testify" at detention hearing); *United States* v. *Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986) (District Court did not abuse its discretion in denying defendant's request to call witness, who was described as "the government's primary source of information," at detention hearing); *United States* v. *Delker*, 757 F.2d 1390, 1397–98 (3d Cir. 1985) (District Court did not abuse its discretion in denying

defendant's request to subpoena material government witnesses to testify at detention hearing); *United States v. Sanchez*, 457 F. Sup. 2d 90, 92 (D. Mass. 2006) (defendant does not have absolute right to subpoena adverse witnesses at detention hearing); *United States v. Goba*, 240 F. Sup. 2d 242, 247–49 (W.D.N.Y. 2003) (court declined to exercise its discretion to require in-court testimony from government agents at detention hearing).

Of course, an order of preventive detention results in physical confinement, a condition aptly characterized as "the ultimate deprivation of liberty"; *United States v. Melendez-Carrion*, 790 F.2d 984, 998 (2d Cir.) (Newman, J.), cert. dismissed, 479 U.S. 978, 107 S. Ct. 562, 93 L. Ed. 2d 568 (1986); see also *United States v. Perry*, 788 F.2d 100, 113 (3d Cir.) ("civil detention order results in the deprivation of the most fundamental of all personal liberties"), cert. denied, 479 U.S. 864, 107 S. Ct. 218, 93 L. Ed. 2d 146 (1986); whereas the protective order issued in the present case merely barred the defendant from returning to his home. Without minimizing the nature of the deprivation that occurs when a person is ordered to stay away from his own home, such a restriction cannot compare to the loss of liberty that a person suffers upon being incarcerated without bail in advance of trial. Because a defendant has no absolute right to call witnesses or to require the government to present live testimony even at a detention hearing; see, e.g., *United States v. Acevedo-Ramos*, supra, 755 F.2d 207–208;[16] a defendant has no greater proce-

---

[16] In *Acevedo-Ramos*, the court concluded that "the magistrate or judge possesses adequate power to reconcile the competing demands of speed and of reliability, by selectively insisting [on] the production of the underlying evidence or evidentiary sources [when] their accuracy is in question. Through sensible exercise of this power of selection, the judicial officer can make meaningful [the] defendant's right to cross-examine [and to compel the attendance of witnesses] without unnecessarily transforming the [detention] hearing into a full-fledged trial or [the] defendant's discovery expedition." *United States v. Acevedo-Ramos*, supra, 755 F.2d 207–208.

dural rights when, as in the present case, he remains at liberty pending trial.[17]

## B

The defendant also cannot prevail under the *Mathews* balancing test. As I previously noted, that test is fact bound and requires consideration of three factors: (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of [that] interest" upon application of the challenged procedures, "and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the [state's] interest, including the function involved and the fiscal and administrative burdens" resulting from any additional or substitute procedural requirement. *Mathews* v. *Eldridge*, supra, 424 U.S. 335. Analysis of these factors "requires balancing the [state's] interest in existing procedures against the risk of erroneous deprivation of a private interest inherent in those procedures." (Internal quotation marks omitted.) *State* v. *Long*, 268 Conn. 508, 524, 847 A.2d 862, cert. denied, 543 U.S. 969, 125 S. Ct. 424, 160 L. Ed. 2d 340 (2004). Furthermore, "[t]here is

---

[17] I note that, in addition to its historical analysis, the court in *Medina* also considered whether the challenged procedure "transgresses any recognized principle of fundamental fairness in operation." (Internal quotation marks omitted.) *Medina* v. *California*, supra, 505 U.S. 448. As the Oregon Court of Appeals has observed, "[t]he recognized principles of fundamental fairness, aside from those enumerated in the [b]ill of [r]ights, are narrow in scope. [*Dowling* v. *United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990)]. They concern matters that are basic to our conception of justice and that define the community sense of fair play, so that a failure to protect the principles in any given case would necessarily deprive a defendant of a fair [hearing]. Id., 353. . . . They are also the sorts of principles about which there can be no reasonable disagreement." *State* v. *Amini*, 175 Or. App. 370, 379–80, 28 P.3d 1204, review denied, 333 Or. 73, 36 P.3d 974 (2001). No such established principle of fundamental fairness is violated by operation of the statutory scheme at issue in the present case. This aspect of the *Medina* test, therefore, provides no support for the defendant's claim that he is entitled to a full evidentiary hearing to challenge the protective order issued in this case.

no per se rule that an evidentiary hearing is required whenever a liberty interest may be affected." *State* v. *Lopez*, supra, 235 Conn. 492–93. "When determining what procedures are constitutionally required, we must bear in mind that [t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice of the case against him and [an] opportunity to meet it. . . . The elements of notice and opportunity, however, do not require a judicial-type hearing in all circumstances. . . . [As] long as the procedure afforded adequately protects the individual interests at stake, there is no reason to impose substantially greater burdens on the state under the guise of due process." (Citations omitted; internal quotation marks omitted.) Id., 493. With these principles in mind, I conclude that the hearing contemplated under §§ 54-63c (b) and 46b-38c (e), pursuant to which the trial court may, in its discretion, require the state to adduce non-hearsay testimony or permit the defendant to subpoena a particular witness or witnesses, fully complies with the dictates of due process.

With respect to the first factor, it cannot be disputed that the defendant's liberty interest in residing at his home with his children is an extremely significant one. As the defendant maintains, courts have acknowledged that these interests are compelling. See, e.g., *United States* v. *James Daniel Good Real Property*, 510 U.S. 43, 53–54, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993) ("right to maintain control over [one's] home, and to be free from governmental interference, is a private interest of historic and continuing importance"); *Lehrer* v. *Davis*, 214 Conn. 232, 237, 571 A.2d 691 (1990) ("right to family integrity includes the most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state" [internal quotation marks omitted]). It is important to underscore, however, that

the liberty deprivation at issue in the present case is both temporary in duration and limited in nature. The deprivation is temporary because the order is effective only until the defendant's criminal case is resolved, at which time the terms of the order will be revisited, depending, of course, on the outcome of the trial. The defendant, moreover, has both a constitutional and a statutory right to a speedy trial,[18] rights that guarantee that he will not be subjected to indefinite delay in the adjudication of his case. The deprivation is limited in the sense that the defendant retains the vast majority of the rights that he was free to exercise before his arrest. Aside from avoiding contact with the victim, he is free to go anywhere except the family home. Furthermore, under the terms of the modified protective order, the defendant apparently is entitled to liberal visitation with his children. Thus, although the defendant's interests are substantial, the deprivation is limited, both in time and scope.

The second factor entails an evaluation of the risk of an erroneous deprivation of liberty under the existing statutory provisions, which include the right to be heard, the right to provide the court with any relevant evidence or information, and the right to rebut any evidence or information that the state may offer. Because the defendant does not have a statutory right to a full evidentiary hearing at which he is entitled to call the victim as a witness, this second *Mathews* factor

---

[18] General Statutes § 54-82m provides in relevant part that, "in any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of a criminal offense shall commence within twelve months from the filing date of the information or indictment or from the date of the arrest, whichever is later . . . ." Practice Book § 43-39 (c) provides for the same right. Of course, the defendant also has federal and state constitutional rights to a speedy trial; see U.S. Const., amends. VI and XIV; Conn. Const., art. I, § 8; but those rights do not carry any specific time requirements within which the trial must take place.

also requires consideration of the probable value that such a hearing would have in safeguarding the defendant's interests, with due regard for the fact that the defendant retains the right to seek the court's permission to subpoena and question the victim. In support of his contention that the risk of an erroneous deprivation of his significant liberty interests is sufficiently high to require such a hearing, the defendant points to an empirical study indicating that the substantiation rate for allegations of domestic abuse of the kind alleged in the present case is approximately 74 percent.[19]

It is no doubt true that, at least in some instances, permitting the defendant in a case involving a family violence crime to adduce testimony from the victim of that crime would increase the likelihood of an accurate determination of the need for a protective order barring the defendant from returning to his home. This is so because the court would be able to evaluate the victim's credibility upon cross-examination by the defense. See *California* v. *Green*, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970) (characterizing cross-examination as "the greatest legal engine ever invented for the discovery of truth" [internal quotation marks omitted]). Existing procedures, however, provide the defendant with significant safeguards. The defendant's arrest for a family violence offense necessarily is predicated on a judicial finding of probable cause; see *Gerstein* v. *Pugh*, supra, 420 U.S. 114; and the defendant is entitled to notice and an opportunity to be heard with respect to the issuance of a protective order. See General Statutes § 46b-38c (e). As I have explained; see footnote 15 of

---

[19] The cited study used published judicial opinions in cases alleging family violence for the purpose of determining the substantiation rate of those claims. M. Shaffer & N. Bala, "Wife Abuse, Child Custody and Access in Canada," 3 J. Emotional Abuse 253, 257 (2003). Because of the difficulties associated with proving abuse, the authors of the study suggest a likelihood that the 74 percent figure represents an understatement of the actual percentage of well founded abuse claims. Id., 259–61.

this opinion; the defendant is free to provide the trial court with reasons why it should decline to credit the evidence and information adduced by the state in support of the issuance of a protective order and why the victim's testimony is necessary to ensure a fair resolution of the issue. In addition, the report and recommendation of the local family violence intervention unit must be made available to the court when it makes its determination as to the propriety of a protective order. General Statutes § 46b-38c (d). The report and recommendation provide the court with valuable, neutral information and advice regarding the need for a protective order, and represent important procedural safeguards of the rights of those charged with family violence crimes. Furthermore, the defendant may obtain a modification or dissolution of the protective order at any time during the pendency of the criminal case if the defendant has adequate grounds for obtaining such relief. See Practice Book § 38-13 ("[t]he judicial authority shall have the power to modify or revoke at any time the terms and conditions of release as provided for in these rules"). Finally, the defendant is entitled to an expedited review procedure. See General Statutes § 54-63g ("Any accused person or the state, aggrieved by an order of the Superior Court concerning release, may petition the Appellate Court for review of such order. Any such petition shall have precedence over any other matter before said Appellate Court and any hearing shall be heard expeditiously with reasonable notice."). These existing procedural protections substantially reduce the risk of an unwarranted infringement on the defendant's rights.

Application of the third *Mathews* factor leads to the conclusion that the state has a strong interest in retaining the existing procedures. As the state has explained, "[a]llowing the government to establish both the factual predicate and need for a criminal protective

order by the use of police reports, victim affidavits and the report and recommendation of the local family services unit, without also requiring that the victim subject herself to cross-examination, greatly advances the government's compelling interest in protecting victims of domestic violence and their children before a defendant charged with a family violence crime is released into the community [or permitted to return to the family home] pending trial . . . and, at the same time, serves to enhance the integrity of the criminal trial process itself by reducing the risk of witness intimidation."

Because the state may take reasonable steps to ensure that a trial will take place, "[p]rocedures may . . . be used both to secure the defendant's presence at trial and to prevent the defendant from aborting the trial by intimidating witnesses or physically harming them." *United States* v. *Melendez-Carrion*, supra, 790 F.2d 1002. The concern of witness intimidation is especially great in domestic violence cases. As one court has stated, due to the nature of the relationship between the victim and the abuser, "even a victim who reports an abusive family member to police may later protect the person by denying, minimizing, or recanting the report. . . . Thus, the prosecution of domestic violence cases presents particular difficulties. Unlike conventional cases . . . [in which] prosecutors rely on the cooperation and participation of complaining witnesses to obtain convictions, in domestic violence cases prosecutors are often faced with exceptional challenges. Such challenges include victims who refuse to testify, who recant previous statements, or whose credibility is attacked by defense questions on why they remained in a battering relationship." (Citations omitted; internal quotation marks omitted.) *People* v. *Brown*, 33 Cal. 4th 892, 899, 94 P.3d 574, 16 Cal. Rptr. 3d 447 (2004); see also *State* v. *Borrelli*, 227 Conn. 153, 168–69, 629 A.2d 1105 (1993) (approving state's use of testimony con-

cerning "battered woman's syndrome" to explain why victims of domestic abuse sometimes remain in destructive relationships, do not report abuse in timely manner, and recant their complaint or testimony concerning abuse); *State* v. *Foreman*, 680 N.W.2d 536, 538 (Minn. 2004) (same). Because victims of family violence are unusually susceptible to intimidation and frequently are fearful of confronting their abusers, I agree with the state that requiring a victim of such abuse to testify in a court proceeding, during which she is subject to examination by defense counsel, no more than a few days after reporting the crime, would be very likely to cause significant further trauma to the victim. Such a requirement also would deter some victims of family violence from reporting their abuse to the authorities. Because family violence "is a problem of immense proportions . . . [that] has long been recognized as being at the core of other major social problems . . . [including] [c]hild abuse, other crimes of violence against person or property, juvenile delinquency, and alcohol and drug abuse"; (internal quotation marks omitted) *State* v. *Karas*, 108 Wash. App. 692, 700, 32 P.3d 1016 (2001); the state has a compelling interest in encouraging victims of family violence to come forward. Granting to defendants in family violence cases the unconditional right to interrogate their alleged victims within days of their arrest would immeasurably undermine this important state interest.

It also would result in a serious administrative burden. Under the scheme advocated by the defendant, the trial court would be obligated to conduct a full evidentiary hearing, at the defendant's request, in any case in which the state seeks a family violence protective order that, if issued, would result in a significant deprivation of the defendant's liberty. Although the majority does not attempt to identify the kinds of liberty deprivations that would trigger the right to a full eviden-

tiary hearing, a defendant necessarily would be entitled to such a hearing in any case in which the court was considering a financial condition of release that the defendant could not make, thereby resulting in his pretrial confinement in lieu of bail.[20] Nonfinancial conditions of release other than a condition that the defendant cannot return home, such as a curfew, home confinement, strict travel limitations and restrictions on child visitation, all involve significant liberty deprivations that implicate fundamental rights; consequently, they, too, presumably would give rise to a full evidentiary hearing.

Moreover, there is no reason why entitlement to a full evidentiary hearing would be restricted to defendants in family violence cases whose conditions of release have resulted in a significant liberty deprivation. In fact, the due process principle that the defendant advances would apply to any defendant who, as a result of a condition of bail or release, suffers a significant deprivation of liberty. Consequently, the administrative burden on our courts would not be limited to family violence cases but would extend to many other cases. This burden on the state and on the courts would be great.

In addition, the evidentiary hearing contemplated by the defendant would be a minitrial on the merits of the state's case against the defendant. This is the necessary result of the constitutional claim that the defendant raises because the propriety of an order barring the defendant from residing at his home will depend largely, if not entirely, on whether the trial court is persuaded by the state's evidence that the defendant, in fact, had committed the family violence offense with which he was charged. If so, then it is extremely likely that the

---

[20] This is so because a defendant who is incarcerated pending trial suffers a far greater liberty deprivation than a defendant who is banned from the family home until the conclusion of his criminal case but who nevertheless remains at liberty.

court will issue the protective order. The more questions that the defendant can raise about the state's case—for example, by casting doubt on the veracity of the state's witnesses, including, most importantly, the victim—the better the defendant's chances are that the court will not issue the order that the state has sought. Thus, a full evidentiary hearing regarding the issuance of the protective order would closely resemble, if not mirror, the criminal trial itself. The state "has an obvious interest in not conducting a full-blown criminal proceeding twice, once for [purposes of determining the conditions of release] and a second time for the trial on the charges." *United States* v. *Edwards*, supra, 430 A.2d 1337. "[W]ith regard to the [state's] witnesses, and particularly the complaining witness, the [state has] an interest in preventing premature discovery. It also has an interest in protecting the emotional and physical well-being of its witnesses." Id., 1338.

Balancing the relevant factors, including, of course, the risk that use of the procedures now in place will result in an erroneous deprivation of the defendant's right to remain in his home pending trial, I believe that it is clear that the defendant has failed to establish that his interest in an unconditional right to cross-examine the victim at the hearing on the protective order outweighs the state's countervailing interest in a proceeding that does not necessarily involve such testimony. Although the defendant has a significant stake in the outcome of the hearing, his interests are protected by several important procedural safeguards, including the opportunity to persuade the trial court that live testimony, from the victim or anyone else, is necessary to a fair determination of whether the defendant should be barred from returning to his home.

This result, which is mandated by *Mathews*, also is dictated by the fact that the condition imposed on the defendant as a result of the protective order is no differ-

ent than any other condition of bail or release, and no jurisdiction ever has held that the imposition of such a condition gives rise to an absolute right to a full evidentiary hearing. Indeed, as I explained previously, because a defendant is not entitled to call adverse witnesses at a pretrial detention hearing or at a bail hearing that results in the setting of a financial condition of release that the defendant cannot meet, thereby resulting in his pretrial incarceration, then, ipso facto, a defendant who is released into the community subject to one or more conditions has no absolute right to call adverse witnesses. I note, finally, that this conclusion also finds support in cases in which this court has determined that due process does not require an adversarial evidentiary hearing before a trial court may order a defendant to register as a sex offender; *State* v. *Arthur H.*, 288 Conn. 582, 609, 953 A.2d 630 (2008); that it is not a violation of due process for a trial court to rely on an unsworn statement in an arrest warrant to determine whether the defendant poses a risk to public safety, as long as the statement contains a minimum indicia of reliability; *State* v. *Bletsch*, 281 Conn. 5, 20–22, 912 A.2d 992 (2007); and that due process is not violated when a trial court's determination rests on reasonably reliable, unsworn or out-of-court information at the time of sentencing. *State* v. *Eric M.*, 271 Conn. 641, 649–50, 858 A.2d 767 (2004).

IV

My first and primary disagreement with the majority stems from its analysis and conclusion with respect to the nature of the hearing required under §§ 54-63c (b) and 46b-38c (e). The majority construes those provisions, first, as establishing a bifurcated hearing procedure and, second, as granting a defendant certain

procedural rights and denying him certain others.[21]
Even a most cursory review of the majority opinion,
however, reveals that its interpretation of the term
"hearing" in § 54-63c (b) is founded on nothing more
than a series of bald assertions that are unsupported
by analysis or evidence. Primarily because the legisla-
ture has elected to treat a protective order issued under
those statutory provisions in the same manner as any

[21] As I previously indicated, I agree with the majority's conclusion that
the defendant is not entitled to a full-blown evidentiary hearing under §§ 54-
63c (b) and 46b-38c (e). I cannot agree with that portion of the majority's
analysis, however, in which it relies on the doctrine of legislative acquies-
cence with respect to its construction of P.A. 07-123, which amended General
Statutes (Rev. to 2007) § 54-63c (b) in 2007. Specifically, the majority con-
tends that we may presume that when the legislature amended General
Statutes (Rev. to 2007) § 54-63c (b), it was aware of *State* v. *Doe*, 46 Conn.
Sup. 598, 609–10, 765 A.2d 518 (2000), a Superior Court case in which the
court held that an evidentiary hearing is not constitutionally required under
§ 46b-38c, and that the legislature's failure "to amend [that] statute by impos-
ing specific hearing requirements when it enacted P.A. 07-123" is "signifi-
cant" in light of the holding of *Doe*. In my view, the majority stretches the
doctrine of legislative acquiescence beyond its breaking point. Although we
presume that the legislature is aware of this court's interpretation of statutes;
see, e.g., *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 494–95, 923
A.2d 657 (2007); we indulge in that presumption in large measure because
the construction of a statute by this court represents the definitive, legally
binding interpretation of that statute for *all* future cases and purposes in
this state, unless and until the legislature amends the statute. For the same
reason, it may be appropriate to apply the doctrine of legislative acquies-
cence to Appellate Court cases involving the construction of a statute
because the statutory interpretation adopted by the Appellate Court also is
binding statewide unless and until this court overrules the Appellate Court's
interpretation or the legislature amends the statute. A Superior Court deci-
sion, by contrast, is binding only on the parties to that particular case. I
therefore see no basis for reading anything into the legislature's failure to
act in response to one Superior Court decision—irrespective of whether
that decision, like *Doe*, has been published in the Connecticut Supplement—
because the legislature generally will have little, if any, incentive to do so
in light of the fact that the case has no binding effect on any court in the
state. It therefore is unreasonable to presume that the legislature's failure
to act in response to *Doe* signals its agreement with that case. It is just as
likely that the legislature either was not aware of the case at all or that it
did not view the case, standing alone, as being sufficiently important to
warrant any remedial legislative action.

other condition of bail or release; see General Statutes § 46b-38c (e) (any order of protection issued thereunder "shall be made a condition of the bail or release of the defendant"); there is no reason to conclude that the hearing to which a defendant has a right under §§ 54-63c (b) and 46b-38c (e) is any different from any other hearing to which a defendant is entitled for purposes of challenging a condition of bail or release.

Recognizing that § 54-63c (b) expressly provides for a hearing at the time of presentment in accordance with § 54-1g (a), which in turn provides that a person arrested for a family violence crime shall be presented on the next day that court is in session, the majority first concludes that the hearing contemplated under §§ 54-63c (b) and 46b-38c (e) is a bifurcated one. Thus, under the construction that the majority advances, a person arrested for a family violence crime is entitled to a preliminary hearing on the protective order the day that he is presented pursuant to § 54-1g (a) and, upon the request of the defendant at that first proceeding, a second, more expansive hearing within a reasonable time thereafter.

The majority next identifies with specificity the parameters of the more expansive hearing under § 46b-38c (e). In particular, the majority concludes that the term "hearing" for purposes of that provision means that (1) the state may, if it wishes, establish the need for a protective order on the basis of "reliable hearsay,"[22] (2) if the state presents live witnesses, those witnesses are subject to cross-examination by the defendant, (3) the state must demonstrate the need for a family violence protective order by a preponderance of the evidence, (4) the defendant does not have a right to call the alleged victim, (5) the defendant also does not have the right to subpoena other adverse witnesses

---

[22] The majority does not explain what it means by "reliable" hearsay.

to the hearing, (6) the defendant may, in the court's discretion, testify at the hearing, and (7) the defendant also may, in the court's discretion, call other witnesses who are willing to testify on his behalf. As I explain more fully hereinafter, the bifurcated hearing comprised of the foregoing multiple components is nowhere to be found in our statutory scheme; rather, it has been fashioned out of whole cloth by the majority.

The majority's determination that § 54-63c (b) contemplates a bifurcated hearing procedure is truly startling in light of the complete lack of support for that interpretation. There is absolutely nothing in the statutory language, the pertinent legislative history or anywhere else to substantiate the majority's interpretation. Indeed, it would appear that the majority's construction is barred by General Statutes § 1-2z,[23] which mandates application of the plain language of a statute unless that language leads to a bizarre or unworkable result. The relevant statutory language is perfectly clear; General Statutes § 54-1g (a) provides that a person arrested for a family violence crime *"shall be promptly presented before the superior court sitting next regularly* for the geographical area where the offense is alleged to have been committed"; (emphasis added); and General Statutes § 54-63c (b) provides that, "[o]*n such date,* the *court shall conduct a hearing* pursuant to section 46b-38c *at which the defendant is entitled to be heard* with respect to the issuance of a protective order." (Emphasis added.) The majority's conclusion regarding the bifurcated nature of the hearing under § 46b-38c (e) contradicts the language of § 54-63a (b), which plainly and unambiguously provides that a person arrested for

[23] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

a family violence crime is entitled to the hearing established under § 46b-38c (e) *at his presentment.* Under the majority's interpretation, however, the defendant is denied a meaningful opportunity to be heard at the time of presentment and, instead, must wait until the scheduling of a second hearing, to be held within some unspecified "reasonable period of time" in the future, and then only "[upon] the defendant's request made at [the time of the first hearing] . . . ." The majority simply announces that this bifurcated procedure is statutorily mandated upon request but makes no attempt to explain the rationale, linguistic or otherwise, underlying its assertion.

The statutory construction that the majority adopts apparently is predicated on its belief that it would be impracticable for arraignment courts to hold the kind of hearing that the majority concludes is required by the statutory scheme. Putting aside the issue of whether that concern is justified in view of the relatively limited nature of the hearing that the majority asserts has been established under § 54-63c (b), a hearing that the majority itself states is likely to be "brief"; footnote 26 of the majority opinion; I submit that the majority's bifurcated hearing procedure is nothing more than a construct to accommodate the conclusion that the defendant is entitled to something more than a bail hearing. Thus, the majority, not the legislature, has created the two stage hearing; if the legislature had intended to create such a procedure, it easily could have manifested that intent expressly. E.g., *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 299, 933 A.2d 256 (2007) (legislature knows how to convey its intent expressly).

Of course, under our law, bail hearings routinely are conducted in arraignment court. It is far more likely, therefore, that the legislature, aware of that fact, fully expected that the hearing under § 54-63c (b) would be

conducted at the defendant's first court appearance and would be the same as a hearing on any other condition of bail or release.

This conclusion also finds strong support in the fact that, under General Statutes § 46b-38c (e), a protective order is expressly deemed a "condition of the bail or release of the defendant . . . ." This language constitutes powerful evidence that the legislature intended to treat the issuance of a protective order under § 46b-38c (e) in the same manner as any other bail condition. Indeed, in the absence of any evidence of a contrary legislative intent—and the majority identifies none—the legislative decision to treat a protective order as a condition of release is alone sufficient to defeat the conclusion that the hearing contemplated by the legislature for purposes of §§ 54-63c (b) and 46b-38c (e) differs in any way from a bail hearing.

The majority's construction suffers from other serious infirmities. First, as the majority has observed, "[a] review of other criminal procedure statutes demonstrates that, when the legislature has desired to impose specific requirements on the conduct of a pretrial hearing, it has said so explicitly." The majority offers as examples General Statutes § 54-82r, which authorizes courts to impose protective orders prohibiting the harassment of witnesses in criminal cases, and General Statutes § 54-64f, which authorizes courts to impose different conditions of release or to revoke the bail of defendants who have violated one or more release conditions. Each of these provisions delineates the general nature of the hearing established thereunder.[24] If

---

[21] Under General Statutes § 54-82r (a), "a court may issue a protective order prohibiting the harassment of a witness in a criminal case if the court, *after a hearing at which hearsay evidence shall be admissible, finds by a preponderance of the evidence* that harassment of an identified witness in a criminal case exists or that such order is necessary to prevent and restrain the commission of [the crime of tampering with a witness in] violation of section 53a-151 or [the crime of intimidating a witness in violation of §] 53a-151a. *Any adverse party named in the complaint has the right to present*

the legislature had intended to provide for a hearing under §§ 54-63c (b) and 46b-38c (e) that differs materially from the kind of hearing that our courts conduct routinely in setting all other conditions of bail and release, the legislature no doubt would have said so. E.g., *Windels* v. *Environmental Protection Commission,* supra, 284 Conn. 299.

In addition, General Statutes § 54-63a (b) provides for a hearing "pursuant to [§] 46b-38c . . . ." As I previously noted, § 46b-38c (e) is silent with respect to the procedures to be followed at the hearing on the issuance of a family violence protective order. Under that statutory subsection, however, the court has broad discretion to impose conditions of release designed to protect the victim of the alleged family violence crime. Because there is no reason to conclude that the fundamental nature of the hearing required pursuant to § 46b-38c differs depending on the nature of the protective order at issue in any particular case, the hearing procedure that the majority adopts necessarily will be the same whether the court is contemplating an order that impinges on an important liberty interest of the defendant, such as the order in the present case, or one that falls at the other end of the spectrum, such as an order "enjoining the defendant from . . . threatening, harassing, assaulting, molesting or sexually assaulting the victim . . . ." General Statutes § 46b-38c (e). Aside from the fact that there is no evidence whatsoever to suggest that the legislature intended to adopt a "one size fits all" hearing formula, I see no reason why the legislature would have intended to do so.

Furthermore, the majority's holding leads to an untenable, if not bizarre, result, namely, it creates one

*evidence and cross-examine witnesses at such hearing."* (Emphasis added.) Subsections (b) and (c) of General Statutes § 54-64f provide for "an evidentiary hearing *at which hearsay or secondary evidence shall be admissible"* and require proof of a violation of a condition of release *"by clear and convincing evidence . . . ."* (Emphasis added.)

set of procedures for bail hearings in nonfamily violence cases in which the court imposes an order of protection, and another set of procedures for such hearings in cases involving family violence crimes. As I previously have indicated; see part III A of this opinion; in most felony cases, a court may impose, under § 54-64a (c), a nonfinancial condition of release such as requiring the defendant to "comply with specified restrictions on [his or her] travel, association or place of abode" for the express purpose of protecting the safety of the alleged victim. In those cases, the defendant is entitled to a hearing that is no different from any other bail hearing. In a case involving a crime of family violence, however, the majority asserts that a different hearing is required even when the very same condition is being imposed— for example, a condition, such as the one imposed in the present case, prohibiting the defendant from residing at his home—for the very same purpose. This is not a sensible or reasonable result, and the majority has identified nothing in our statutes or anywhere else to explain it.

A review of the majority opinion reveals that the majority's conclusion concerning the nature of the hearing established under §§ 54-63c (b) and 46b-38c (e) is based entirely on a single statement made on the floor of the House of Representatives by the sponsor of the bill that became P.A. 07-123 and on several *civil* cases from other states. Neither the legislative history nor the out-of-state precedent on which the majority relies bears even the slightest relevance to the issue presented by this case.

With respect to the majority's reliance on the legislative history of P.A. 07-123, the majority identifies what it characterizes as "the legislature's desire to satisfy the defendant's due process rights under the fourteenth amendment to the United States constitution . . . [as] reflected in the comments of the sponsor of the bill

enacted as P.A. 07-123, who viewed it as an attempt to 'strike a very delicate balance here between the legitimate interests of law enforcement, and the important constitutional and civil liberty concerns that we would have [as] citizens . . . .' 50 H.R. Proc., [Pt. 12, 2007 Sess.], p. 3904, remarks of Representative [Michael P.] Lawlor." Contrary to the conclusion of the majority, these remarks of Representative Lawlor in no way substantiate the elaborate gloss that the majority places on the statutory language at issue. First, the majority engages in no analysis as to why its statutory interpretation addresses any possible due process concerns; the majority's constitutional analysis is limited to a one paragraph footnote in which it dismisses the defendant's contention that he has a due process right to a full evidentiary hearing. See footnote 21 of the majority opinion. In fact, the reason that the majority gives for rejecting that claim, namely, that a defendant facing a protective order barring him from his residence until the conclusion of his criminal case can have no constitutional entitlement to a full evidentiary hearing if a person who is incarcerated pending trial has no such right; see id.; defeats the majority's suggestion that due process considerations militate in favor of its interpretation of §§ 54-63c (b) and 46b-38c (e). In other words, it is illogical to assume that the legislature would intend that a person who, like the defendant, has been barred by the court from returning to his home pending the disposition of his family violence case is entitled to greater procedural rights than a person who is subject to an order that requires his incarceration prior to trial.

In addition, and perhaps more to the point, the majority takes Representative Lawlor's comment completely out of context. The comment was made in response to a proposed amendment to the bill that ultimately became P.A. 07-123 concerning the authority of the police to release a person arrested for a family violence crime

on a written promise to appear. See 50 H.R. Proc., supra, pp. 3902–3903, remarks of Representative Kevin Witkos. Representative Lawlor was expressing his support for the proposed amendment to its sponsor, Representative Witkos, and his comment had nothing at all to do with the nature of the hearing contemplated under the bill but, rather, with the bill's goal of balancing the rights of the family violence arrestee and the public in vesting the police with authority to impose conditions of release. Thus, the majority's reliance on Representative Lawlor's comment in an effort to rationalize its construction of §§ 54-63c (b) and 46b-38c (e) is entirely misplaced.

The only other authority on which the majority relies in support of its conclusion concerns its determination that the state must prove the need for a protective order by a preponderance of the evidence. Of course, with respect to other conditions of release, the trial court must exercise its sound discretion in determining whether a particular condition is appropriate in any given case. In the present case, however, the majority cites out-of-state precedent involving *civil* domestic violence protective orders as its primary basis for concluding that such a standard applies under § 46b-38c (e). In doing so, the majority fails to explain why the standard of proof applicable to an application for a protective order in a civil case should guide our interpretation of the *criminal* statutory scheme at issue. In particular, the majority makes no effort to explain why a condition of bail or release, such as the protective order issued in the present case, should be subject to the same standard of proof that governs the issuance of such an order when it is sought by a private litigant in a civil matter.[25] The majority's failure to articulate

[25] It is noteworthy that the majority dismisses the defendant's claim that §§ 54-63c (b) and 46b-38c (e) entitle him to the same trial-like proceeding to which a civil litigant is entitled in challenging an application for a family violence protective order but then relies on cases involving civil protective orders to support its conclusion that the state must establish the need for

even a plausible basis for equating the two is fatal to its conclusion that § 46b-38c (e), a criminal statute, embodies a civil standard of proof.[26]

Finally, the majority, in holding that a defendant in a family violence case is somehow entitled to greater procedural safeguards than any other defendant before

a criminal protective order by a preponderance of the evidence. The majority fails to explain this logical inconsistency.

The majority also relies on § 54-82r (a), which pertains to protective orders barring the harassment of a witness in a criminal case, to support its conclusion that §§ 54-63c (b) and 46b-38c (e) require the state to prove the necessity of a protective order by a preponderance of the evidence. The majority's reliance is entirely misplaced, however, because § 54-82r, in marked contrast to §§ 54-63c (b) and 46b-38c (e), expressly provides for that standard of proof. Thus, if the legislature had intended to impose such a requirement under §§ 54-63c (b) and 46b-38c (e), it no doubt would have done so in express terms. Indeed, the majority has acknowledged this principle in rejecting the defendant's claim that he is entitled to a full evidentiary hearing because, as the majority has explained, other related statutory provisions indicate that the legislature uses express statutory language to establish such a standard of proof when it intends to do so. In relying on § 54-82r, however, the majority simply ignores this principle without providing any justification for doing so.

[26] The majority's holding that the state must prove the need for a family violence protective order by a preponderance of the evidence places an additional burden on the state, one that the state does not bear in any other context involving the imposition of conditions of bail or release. Indeed, the state bears no such burden when it seeks a financial or nonfinancial condition of release for purposes of any other case. In all other such cases, the state makes a request for a condition of release and presents its reasons and supporting evidence or information. The defendant is entitled to respond, by way of proffer or, if appropriate, through the presentation of live testimony. The court then must exercise its sound discretion in determining what condition or conditions, if any, to impose. Indeed, even when the state seeks a financial condition of release that the defendant most likely will be unable to meet, the state carries no burden of proof with respect to the propriety of that condition. In such a case, the state merely must demonstrate to the court that the condition is reasonable under the circumstances. After hearing from the defendant, the court then is free to impose whatever financial condition it deems appropriate. In light of the new burden that the majority has placed on the state in family violence cases, the state may be prompted to—or even compelled to—present evidence at the hearing on the protective order that it would not have presented prior to the majority's decision in this case.

a trial court may impose a protective order as a condition of bail or release, ignores the reason why the legislature included an express reference in P.A. 07-123, § 1, which is now codified at § 54-63c, to the hearing requirement of § 46b-38c. That reason is apparent: for the first time, the legislature, under P.A. 07-123, authorized the police to impose orders of protection as a condition of release, and the legislature wanted to ensure that a person who is subject to an order of protection imposed *by a police officer* would promptly be afforded a hearing before *a neutral and detached judicial officer* for a determination of whether that condition should be extended, modified or vacated. Instead of acknowledging this simple and obvious reason for the hearing mandated under §§ 54-63c (b) and 46b-38c (e), the majority tortures the statutory language and history to come up with an interpretation that is completely lacking in support and logic.[27]

---

[27] It may be that the statutory construction that the majority adopts stems from its own concern that the imposition of a criminal protective order in a family violence case "amounts in practice to state-imposed de facto divorce"; J. Suk, "Criminal Law Comes Home," 116 Yale L.J. 2, 42 (2006); because, it has been asserted, the issuance of such an order "shifts the very goal of pursuing criminal charges away from punishment to control over the intimate relationship in the home." Id., 50; see footnote 18 of the majority opinion (quoting J. Suk, supra, 50). To whatever extent that consideration may have affected the majority's construction of the statutory scheme at issue, there is nothing in the statutory scheme or its history to suggest that the legislature had any such consideration in mind when it included a reference to the hearing requirement of § 46-38c (e) in § 54-63c (b).

I note, in addition, my general agreement with the observation of Justice Schaller in his concurring and dissenting opinion that the "special" hearing created by the majority under §§ 54-63c (b) and 46b-38c (e) is "unwise," "unworkable" and "unnecessary . . . ." I emphasize, however, that my disagreement with the majority stems from the fact that this court may not substitute its view of what is wise, workable or necessary for the considered judgment of the legislature, and the legislature has made it clear, contrary to the conclusion of the majority, that the hearing contemplated under §§ 54-63c (b) and 46-38c (e) is to be held at the time of the defendant's presentment and is no different from the hearing that is routinely conducted at that time with respect to all other conditions of bail or release.

## V

I also disagree with the majority insofar as it reverses Judge Bingham's decision to reject the defendant's claim that he has a right to a full evidentiary hearing. Because the majority also concludes that the defendant was not entitled to such a hearing, the trial court's decision should be affirmed, not reversed. Of course, the defendant has a right under General Statutes § 54-69[28] to return to court for the purpose of challenging the protective order, and any such hearing necessarily will accord with the new standards set forth by the majority in its decision. But even under its own resolution of the present appeal, the majority is wrong in reversing the trial court.

The majority itself correctly characterizes the claim that the defendant raised in the trial court as follows: "The defendant argued that he was entitled to a full evidentiary hearing under both § 54-63c and the due process clause of the fourteenth amendment to the United States constitution . . . . Judge Bingham denied the defendant's request for an evidentiary hearing, reasoning that the procedure for issuing a domestic

---

[28] General Statutes § 54-69 provides in relevant part: "(a) Whenever in any criminal prosecution the state's attorney for any judicial district or the assistant state's attorney is of the opinion that the bond without or with surety given by any accused person is excessive or insufficient in amount or security, or that the written promise of such person to appear is inadequate, or whenever any accused person alleges that the amount or security of the bond given by such accused person is excessive, such state's attorney or assistant state's attorney or the accused person may bring an application to the court in which the prosecution is pending or to any judge thereof, alleging such excess, insufficiency, or inadequacy, and, after notice as hereinafter provided and hearing, such judge shall in bailable offenses continue, modify or set conditions of release upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the accused in court: (1) Upon such person's execution of a written promise to appear, (2) upon such person's execution of a bond without surety in no greater amount than necessary, (3) upon such person's execution of a bond with surety in no greater amount than necessary. . . ."

violence protective order in criminal cases 'is similar to a bail hearing, and you're not entitled to a full trial on a bail hearing.' "

This is the same claim that the defendant has raised in this court. The majority aptly characterizes that claim, as well, explaining that the defendant contends on appeal that "the trial court improperly failed to conduct an evidentiary hearing prior to issuing a criminal protective order because § 54-63c (b) 'expressly require[d]' the trial court to hold such a hearing when he first appeared in court. The defendant argues that the word 'hearing,' as used in § 54-63c (b), means an adversarial and formal adjudicative proceeding at which issues of fact and law are tried, evidence is taken, and witnesses and parties are heard. The defendant further contends that the cross-reference in § 54-63c (b) to § 46b-38c, the family violence criminal procedure statute that authorizes courts to impose criminal protective orders at the defendant's first court appearance . . . requires that the criminal statute be applied consistently with the similarly worded . . . § 46b-15, which, he argues, contemplates a full evidentiary hearing within fourteen days of the ex parte issuance of a civil domestic violence temporary restraining order." (Citation omitted.) The defendant also claims on appeal that he is entitled to the same right to a full evidentiary hearing under the due process clause of the fourteenth amendment.[29]

---

[29] The majority asserts that the defendant does not claim that he is constitutionally entitled to call or question the victim at the hearing required under §§ 54-63c (b) and 46b-38c (e). See footnote 21 of the majority opinion. This assertion is erroneous. The defendant claims that he has a due process right to a full evidentiary hearing at which he is entitled to "present evidence and cross-examine witnesses." In setting forth his claim, the defendant makes no suggestion that his constitutionally protected right to such a hearing does not include the right to question the victim. On the contrary, the defendant contends that " 'written submissions [by the state] are a wholly unsatisfactory basis for [a] decision' " because such evidence does not provide an adequate opportunity to challenge the state's factual contentions. Indeed, the defendant maintains that, because cases involving the issuance

Thus, as the majority expressly recognizes, the defendant consistently has claimed that he is entitled, both statutorily and as a matter of due process, to nothing less than a full evidentiary hearing before the court may issue a family violence protective order under §§ 54-63c (b) and 46b-38c (e).[30] Although the majority, like the trial court, concludes that the defendant is not entitled to such a hearing—the only issue that the trial court was asked to resolve—the majority nevertheless deems it appropriate to render judgment reversing the trial court. It is axiomatic, however, that this court will affirm the judgment of a trial court when, as in the present case, we agree with the result reached by the trial court even if we disagree with its reasoning. The majority's refusal to affirm the trial court in the present case, therefore, is completely unsupportable.

Indeed, the trial court characterized the hearing to which the defendant is entitled as "similar to a bail hearing . . . ." In fact, under the majority's interpretation of §§ 54-63c (b) and 46b-38c (e), the hearing to which a defendant is entitled thereunder *is* similar to a bail hearing. The majority agrees with the trial court that the defendant has no right to have the state prove its case with live testimony, no right to bar the state from using hearsay evidence, no right to call the alleged victim and no right to subpoena witnesses. The defendant, however, may, in the court's discretion, testify and call witnesses who are willing to testify on his behalf. These procedural rules are no different than the rules governing bail hearings, and the majority does not

of family violence protective orders should not be "decided without hearing both sides," principles of due process grant him the right to have the alleged victim "testify in an adversarial court hearing to ensure that [the] . . . protective order is issued [on the basis of] accurate information." Thus, at no time has the defendant conceded that he does not have a constitutional right to examine the victim at the hearing.

[30] I note that the defendant's appellate counsel reiterated that position at oral argument before this court.

contend otherwise. In any event, to the extent that the hearing contemplated by the majority differs at all from a bail hearing—at which the trial court must exercise its sound discretion in determining how to proceed under the particular circumstances presented—it certainly is *far* more akin to a bail hearing than the full evidentiary hearing that the defendant sought in the trial court and seeks on appeal to this court.

The majority asserts that, although Judge Pavia did afford the defendant the initial or preliminary hearing that, in the majority's view, is required under our statutory scheme, Judge Bingham must be reversed because the defendant "did not receive [the] subsequent hearing *as requested* . . . ." (Emphasis added.) This statement by the majority represents a mischaracterization of the record because *the defendant never requested the hearing to which the majority now concludes he was entitled*; indeed, he never even requested the opportunity to present any witnesses, evidence or other information. As I have explained, and as the majority expressly has acknowledged, the only hearing that the defendant sought was a full evidentiary hearing at which the state would be required to present testimony in compliance with the rules of evidence. The majority agrees that Judge Bingham properly denied the defendant's request for such a hearing. It is simply wrong, therefore, to assert that Judge Bingham must be reversed because he improperly declined to grant the defendant a hearing "as requested."

Unable to explain its reversal of Judge Bingham by reference to the facts and record of this case, the majority turns to another case, *Rowe* v. *Superior Court*, 289 Conn. 649, 960 A.2d 256 (2008), to support its conclusion. In *Rowe*, this court concluded, inter alia, that the plaintiff in error had preserved his common-law claim challenging the propriety of the trial court's imposition of multiple contempt findings against him. Id., 660, 663.

*Rowe* is wholly inapposite, however, because the defendant in the present case *never* has claimed that he is entitled to anything other than a full, trial-like hearing, let alone the hearing that the majority determines he is entitled to under the applicable statutory scheme. Nevertheless, the majority's sole argument is derived from *Rowe*, namely, that reversing Judge Bingham will not result in what the majority characterizes as a "judicial ambush . . . ." Footnote 26 of the majority opinion. This assertion, however, has no basis in fact; reversing the trial court in the present case most certainly does achieve that unwarranted result because Judge Bingham, in rejecting the defendant's request for a full evidentiary hearing, *properly* resolved *the only claim before him.* In other words, in contrast to *Rowe*, in which this court concluded, by express reference to the trial court proceedings, that the court had been placed on notice of the claim that the plaintiff in error raised on appeal; see *Rowe* v. *Superior Court*, supra, 662–63; the trial court in the present case had no such notice. In the present case, Judge Bingham was asked to decide only whether the defendant had a right to a full evidentiary hearing and not whether he had a right to the limited hearing that the majority has recognized today.[31]

Indeed, in characterizing the defendant's claim in the trial court and on appeal, the majority itself acknowledges that the defendant's claim is the same in both courts, namely, that he has a right to a full, trial-like hearing. Despite this express acknowledgment, the majority nonetheless asserts that it "represents a hyper-

---

[31] The majority predicts that the hearing to which the defendant will be entitled on remand will be "a brief hearing." Footnote 26 of the majority opinion. By contrast, the full, trial-like hearing to which the defendant consistently has claimed he is entitled—a hearing at which the state would be required to proceed on the basis of admissible, live testimony and the defendant would have the right to call the victim if the state failed to do so— is hardly comparable to the "brief" hearing that the majority contemplates.

technical and unduly restrictive application of the rules of preservation" to conclude that the "particular conclusion of law that [the majority] adopt[s]" was not preserved. Footnote 26 of the majority opinion. The majority, however, completely ignores the sine qua non of preservation, namely, *fair notice* of the claim to the trial court. See, e.g., *State* v. *Ross*, 269 Conn. 213, 335–36, 849 A.2d 648 (2004) ("the essence of the preservation requirement is that *fair notice* be given to the trial court of the party's view of the governing law" [emphasis in original]). Tellingly, the majority opinion makes no reference to the notice requirement and contains no discussion of how the defendant's arguments placed the trial court on fair notice of the statutory interpretation that the majority adopts today. Under settled principles of preservation, which the majority purports to apply, the majority would have to be satisfied that Judge Bingham was, in fact, accorded a fair opportunity to consider, for his acceptance or rejection, the interpretation of the statutory scheme that the majority has adopted. It simply is not possible to reach that conclusion, however, for as the majority expressly has acknowledged, the defendant "argued [in the trial court] *only* that he was entitled to a full, trial-like, evidentiary hearing." (Emphasis added.) Footnote 26 of the majority opinion. Undaunted by this logical flaw in its analysis, the majority nevertheless insists that it is appropriate to reverse Judge Bingham's ruling.

The majority also seeks to justify its conclusion by reference to the fact that, after Judge Bingham had denied the defendant's request for a full evidentiary hearing, defense counsel questioned the court about the nature of the hearing to which the defendant was entitled. Id. (asserting that reversal "[did] not operate as a judicial ambush of Judge Bingham, as, after he denied the defendant a full, trial-like hearing, defense counsel questioned [Judge Bingham] about the nature

of the hearing to which the defendant was entitled"). Judge Bingham ultimately informed the defendant that he was entitled to a hearing similar to a bail hearing. It is impossible to see how defense counsel's question and Judge Bingham's response to it support a reversal, as our trial courts are responsible for resolving issues presented to them, not for advising parties on how best to proceed. Moreover, in characterizing the hearing as akin to a bail hearing, Judge Bingham said nothing to mislead the defendant, who at no time sought to challenge the state's evidence or introduce any evidence of his own, by way of proffer or otherwise. Simply put, the majority countenances an ambuscade of Judge Bingham by reversing him on the basis of a nonconstitutional claim that never was raised in the trial court and has not been raised on appeal.

More importantly, the majority's approach to preservation—an approach that effectively dispenses with the heretofore critical component of fair notice—is unprecedented and unwarranted. The majority embraces a methodology pursuant to which it is enough to preserve a claim for appeal if the "issue" raised on appeal implicates the same issue that was raised in the trial court. Id. For purposes of the present case, the majority identifies that issue as "what type of hearing is required under § 46b-38c"; id.; and concludes that, because this court is deciding the same "issue" on appeal as the defendant raised in the trial court, the preservation requirement has been satisfied. Heretofore, that requirement would be met only if the *claim* that the defendant raised in the trial court, namely, that he is entitled to a full-blown evidentiary hearing, is also the claim to be decided on appeal. Under the new, issue-oriented approach that the majority invents, however, the preservation requirement is satisfied, irrespective of whether the claim raised on appeal mirrors the claim that had been raised in the trial court, as long as the latter can be character-

ized as implicating the same general "issue"—or, as the majority puts it, the same general "subject of [the] dispute"—as the former. Id.

For very good reason, this court never before has adopted the expansive view of preservation that the majority employs in the present case. Under the majority's approach, if a party claims in the trial court that a statute means one thing (X), and the trial court rejects the party's construction on the ground that the statute means something entirely different (Y), and, then, on appeal, the party argues that the statute has yet a third meaning (Z), the party's claim has been preserved because the "issue" at trial and on appeal is the same, that is, the meaning of the statute. Until now, this has not been the mode of analysis used to determine whether a claim has been preserved for purposes of appeal, and it should not be because, under that methodology, fair notice to the trial court simply is irrelevant; the trial court never was afforded the opportunity to address the party's claim, raised for the first time on appeal, that the statute means Z. In this example, the only claim that the party has preserved is its claim that the statute means X; merely because the particular statutory interpretation urged by the party in the trial court—that is, the party's *claim*—implicated the broader "issue" of the statute's meaning, the party is not entitled to raise *any and all other competing interpretations* of the statute on appeal. That, however, is precisely the approach to preservation that the majority takes in the present case; the statutory interpretation that the defendant advocated in the trial court bears no resemblance to the interpretation of the statute that the majority adopts in the present appeal, yet the majority concludes that the preservation requirement has been satisfied.

A second scenario also highlights the extent to which the majority has departed from settled principles of

preservation. Under present law, if a party objects to the admission of certain evidence on relevancy grounds, and the trial court overrules the objection, and, thereafter, the party claims on appeal that the evidence was inadmissible hearsay, the claim on appeal is not preserved. See, e.g., *State* v. *Cabral*, 275 Conn. 514, 531, 881 A.2d 247 (defendant's claim on appeal that evidence was inadmissible hearsay was not preserved and, thus, not reviewable because defendant raised different objection at trial), cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005); see also *State* v. *Meehan*, 260 Conn. 372, 388–90, 796 A.2d 1191 (2002) (because defendant raised one claim at trial as to why witness' testimony was inadmissible and asserted another, different claim of inadmissibility on appeal, defendant's appellate claim was unpreserved and, therefore, not reviewable). In light of the majority's decision in the present case, however, a party seeking relief on appeal could claim that the "issue" raised by his objection at trial was the inadmissibility of the evidence and, further, that, because his hearsay claim, which he raised for the first time on appeal, implicates that same "issue," the claim would be preserved. Under the analytical model that the majority adopts, I see no reason why that party would not prevail on his preservation argument.[32]

---

[32] The majority incorrectly asserts that I advocate a position pursuant to which a claim would not be preserved for appeal unless the party raising the claim on appeal also made the specific *argument* in support of that claim in the trial court that he relies on on appeal. See footnote 26 of the majority opinion. I take no such position. Indeed, the majority's contention appears to be based on a fundamental misunderstanding of the difference between an argument and a claim. Generally speaking, an argument is a point or line of reasoning made in support of a particular claim. Only claims are subject to our rules of preservation, not arguments. In the present case, the sole claim that the defendant raised in the trial court—and the sole claim he raises on appeal—is entitlement to a full evidentiary hearing. Contrary to the majority's assertion, I do not suggest that, on appeal, the defendant is barred from raising arguments in support of that claim that he did not raise in the trial court. Indeed, the defendant makes *many* more such arguments in his submissions to this court than he made in the trial court, and properly so; in light of the different circumstances under which claims are made at

In sum, by focusing broadly on the *issue* raised in the trial court rather than the *claim* raised in that court, the majority approves of an approach to preservation that differs markedly from the methodology that this court consistently has employed for a very long time. If the majority does not believe that preservation requires fair notice of the claim to the trial court, then it should say so expressly and explain why it has reached that conclusion.[33] It is unacceptable, however, for the majority to purport to apply settled preservation principles, on the one hand, and, on the other, to endorse a far broader and different standard that effectively eliminates the fair notice requirement.[34]

trial and on appeal, that will almost always be the case. It is settled law, however, that a defendant cannot raise a new *claim* on appeal. In the present case, the interpretation of the statute that the majority adopts never has been the subject of a claim by the defendant and, accordingly, it reasonably cannot be characterized as preserved.

[33] Of course, for the reasons set forth previously, I do not believe that any modification of our preservation principles is either necessary or appropriate.

[34] The majority responds to my analysis of its new approach to preservation as follows: "[W]e simply state that, if a defendant asks for relief [in] the trial court that encompasses elements A, B, C and D, that request is adequate to permit relief on appeal that only grants elements A and B, but not C and D. Under Justice Palmer's view, a defendant would need to argue explicitly that, 'if I'm not entitled to A, I am still entitled to B, C and D,' and 'if I'm not entitled to A and B, then I am still entitled to C and D,' and so on, in order to render that relief available on appeal. That strikes us as an unduly onerous burden on litigants." Footnote 26 of the majority opinion. The problem with the majority's response is that it does not represent a fair characterization either of my position or of this case. It is true that, in a particular case, a defendant's claim may be broad enough to encompass several "elements" of relief, as the majority puts it, and yet specific enough to provide the trial court with *adequate notice* of *each* of those elements. The present case, however, manifestly is not such a case. The record is perfectly clear that the defendant raised one claim in the trial court and one claim in this court, namely, an entitlement to a full, trial-like proceeding. Of course, that claim necessarily encompasses other, more narrow claims, such as the statutory interpretation that the majority adopts today, but it most certainly did *not* place the state or the trial court *on fair notice* that the defendant was asserting any one or more of those more narrow claims. Indeed, the defendant rejected the opportunity to proceed as he would have proceeded at a bail hearing even though the trial court characterized the hearing as similar to a bail hearing, a characterization that fairly describes

Finally, although I disagree with the majority's determination as to the nature of the hearing contemplated under §§ 54-63c (b) and 46b-38c (e); see part IV of this opinion; I agree with the majority that we should take this opportunity to explicate the parameters of that hearing. We should do so, however, in the exercise of our supervisory authority over the administration of justice; see, e.g., *State* v. *Connor*, 292 Conn. 483, 518 n.23, 973 A.2d 627 (2009); because the issue is sufficiently important to warrant such an explication, not because the trial court's ruling on the defendant's claim was in any way wrong or improper. Moreover, because § 54-69 entitles the defendant to a modification of the conditions of his release whenever such a modification is warranted, he will be entitled to a hearing of the kind that the majority adopts today merely upon filing an application to dissolve or modify the protective order that was issued in the present case. The majority's reversal of Judge Bingham, however, is both wrong as a matter of law and manifestly unfair to Judge Bingham. "Unfortunately, the majority's conclusion also sends the wrong message to trial judges generally. It is one thing to hold our judges accountable for their decisions on claims that have been presented to them; it is another matter entirely to hold them responsible for failing to decide claims that never were raised. I submit that that is precisely what the majority has done in the present

the hearing that the majority concludes is mandated under the statutory scheme. Because notice is the essence of preservation, and because the trial court had no notice of the claim that the majority decides in the present case, the majority simply is wrong that that claim is preserved. Indeed, I do not doubt that both parties to this appeal will be surprised by the statutory interpretation that the majority has adopted because neither party ever has claimed or even suggested that the majority's interpretation is the proper interpretation of §§ 54-63c (b) and 46b-38c (e). In other words, even the parties themselves are not on notice of the statutory construction that the majority has announced. That is why we should decide this case under our supervisory authority, and not under the pretense of preservation.

case."[35] *Rowe* v. *Superior Court,* supra, 289 Conn. 685
(*Palmer, J.,* concurring).

[35] Justice Schaller, in his concurring and dissenting opinion, also disagrees with my "conclusions that the defendant failed to preserve his claim, that [Judge Bingham's ruling] should be affirmed rather than reversed, and that the majority is unfairly ambuscading [Judge Bingham]." Footnote 4 of the concurring and dissenting opinion. To support his conclusion, Justice Schaller, invoking *Rowe* v. *Superior Court,* supra, 289 Conn. 649, asserts that "the concept of preservation should be liberally interpreted to allow a claim to proceed to decision on the merits." Footnote 4 of the concurring and dissenting opinion. With all due respect to Justice Schaller, there simply is no possible way to conclude, no matter how liberally the record is construed, that Judge Bingham was on notice of the claim that the majority decides. Indeed, Justice Schaller himself acknowledges that "[t]he trial court's ruling certainly was not incorrect under the circumstances" and that "the trial court was not mistaken" in its ruling. Id. The trial court's ruling was correct, as Justice Schaller must concede, because that ruling properly resolved the only claim that the defendant raised, namely, that he was entitled to a full, trial-like hearing. Indeed, as I have explained, the defendant has never raised any other claim, even in this court. In such circumstances, it clearly is improper to reverse the ruling of Judge Bingham because, in doing so, the majority is reversing Judge Bingham with respect to a ruling that the majority *itself* agrees was correct. Although, as I have indicated, I agree that we should take this opportunity to go *beyond* the defendant's claim and explicate the contours of the hearing contemplated under §§ 54-63c (b) and 46b-38c (e), we do so not to resolve the claim that the defendant has raised. On the contrary, the majority, like the trial court, addressed and properly rejected the only claim that the defendant ever has raised, in the trial court or in this court, before setting out the contours of that hearing. It is appropriate to delineate the parameters of the hearing, rather, because this is a public interest appeal, not an appeal from a final judgment, and it is unlikely that we soon will have another opportunity to consider the statutory scheme at issue. As I previously observed, the defendant will benefit from the majority's decision with respect to the nature of that hearing because he is entitled to seek review of the protective order at any time under § 54-69, and he presumably would avail himself of the opportunity to do so under the new hearing protocol that the majority adopts. Nevertheless, the defendant most certainly is not entitled to a reversal of Judge Bingham's ruling on the basis of a nonconstitutional claim that he never has raised.

Moreover, although I agree with Justice Schaller that it should not lightly be asserted that a trial court has been ambushed by an appellate ruling, I can think of no clearer example of such an ambuscade than what the majority has done to the trial court in the present case, that is, reversing the trial court on the basis of a nonconstitutional claim that the court never was asked to resolve. Indeed, that is precisely the kind of appellate decision-making that this court—Justice Schaller included—repeatedly and consistently has refused to countenance. See, e.g., *Rowe* v. *Superior Court,* supra,

## VI

A condition of bail or release that precludes a defendant from residing at his home during the pendency of his criminal case undoubtedly results in a significant liberty deprivation to that defendant. Consequently, our trial courts must carefully evaluate the particular circumstances of each case in deciding whether to impose such a condition. For obvious reasons, however, the imposition of such a condition will be prudent, if not absolutely necessary, in some cases involving family violence, which aptly has been characterized as a "modern-day scourge." J. Kaye, "Delivering Justice Today: A Problem-Solving Approach," 22 Yale L. & Policy Rev. 125, 139 (2004).

Contrary to the conclusion of the majority, there is nothing in our statutory scheme to suggest that the legislature has devised a hearing specially designed for the purpose of determining whether an order of protection should issue in a family violence case. In fact, such orders are no different than other conditions of bail or release, and the legislature expressly has designated them as such. Thus, as I previously explained, the state generally will be able to make its case for the issuance of a protective order on the basis of evidence, such as the alleged victim's sworn statement, that otherwise might not be admissible at trial. And most often, the defendant will be unable to establish a sufficient basis for calling adverse or other witnesses for the purpose of challenging the issuance of such an order. Whether the existence of unusual circumstances may give rise to an exception to these general rules is a determination

289 Conn. 663 (*Schaller, J.*) (allowing party to seek reversal of issue on appeal that party had failed to raise at trial would amount to ambush of trial court); *Certain Underwriters at Lloyd's, London* v. *Cooperman*, 289 Conn. 383, 401, 957 A.2d 836 (2008) (*Schaller, J.*) (characterizing claim that was not raised at trial as "unreviewable" on appeal); *Smith* v. *Andrews*, 289 Conn. 61, 77, 959 A.2d 597 (2008) (*Schaller, J.*) (declining to review "unpreserved" claim not raised in trial court).

that must be made by the trial court, in the exercise of its sound discretion, on a case-by-case basis, with due regard for the interests of all parties. In recognition of the fact that our trial courts are best situated to make such judgments and, thus, to strike the appropriate balance between the rights of the defendant and the legitimate interests of the state and the alleged victim, the legislature has manifested its intent that the desirability of an order of protection shall be determined in the same manner as any other condition of bail or release. The majority, however, disregards this evident legislative intent and, instead, substitutes its own view of what the law should be for what the legislature has decreed by creating a hearing procedure under § 46b-38c (e) in derogation of the procedure endorsed by the legislature. Judicial lawmaking of this sort is never acceptable, least of all with respect to a subject matter of such vital concern as family violence. Within constitutional limits, it is the prerogative of our elected officials, not this court, to determine how best to deal with such public safety issues. Unfortunately, the majority ignores that fundamental principle in the present case. Accordingly, I dissent in part.